# In re Valerie D.*
## (14420)

Callahan, Glass, Borden, Berdon and Santaniello, Js.

*In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 2026, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

Reporter of Judicial Decisions

Argued May 6—decision released August 18, 1992

*Kathryn Emmett,* with whom were *Deborah Fins, Martha Stone, JoNel Newman, Sara R. Martin* and, on the brief, *Joan E. Bertin,* for the appellant (respondent mother).

*Maureen D. Regula,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan T. Pearlman,* assistant attorney general, for the appellee (petitioner).

*Jewel A. Gutman,* for the minor child.

*Janet Bond Arterton, Sara L. Mandelbaum, Talitha Curtis, Nadine Taub* and *Harlon Dalton,* filed a brief for the American Public Health Association as amicus curiae.

*Susan Price-Livingston* filed a brief for the Connecticut Women's Education and Legal Fund et al. as amici curiae.

*Tanina Rostain, Jonathan Levine* and *Deborah S. Freeman* filed a brief for the American College of Obstetricians and Gynecologists et al. as amici curiae.

*Paul Chill,* and *Robert Scheinblum,* certified legal intern, and *Felice Sheramy,* certified legal intern, filed a brief for the Junior League of Hartford et al. as amici curiae.

BORDEN, J. The dispositive issues in this appeal are whether: (1) General Statutes § 45a-717 (f) (2)[1] permits

---

[1] General Statutes § 45a-717 was formerly found at General Statutes § 45-61f, the statutory location in effect at the time of the trial court proceedings in this case. For purposes of clarity and simplicity, we refer herein to the current statutory sections.

General Statutes § 45a-717, formerly § 45-61f, provides as follows: "TERMINATION OF PARENTAL RIGHTS. CONDUCT OF HEARING. INVESTIGATION AND REPORT. GROUNDS FOR TERMINATION. (a) At the hearing held on any petition for the termination of parental rights filed in the court of probate under section 45a-715, or filed in the superior court under section 17a-112, or transferred to the superior court from the court of probate under section 45a-715, any party to whom notice was given shall have the right to appear and be heard with respect to the petition. If the parent who is consenting to the termination of his parental rights appears at the hearing on the petition for termination of parental rights, the court shall explain to the parent the meaning and consequences of termination of parental rights. Nothing in this subsection shall be construed to require the appearance of a consenting parent at the hearing regarding the termination of his parental rights except as otherwise provided by court order.

"(b) If a party appears without counsel, the court shall inform him of his right thereto and upon request, if he is unable to pay for counsel, shall appoint counsel to represent him. No party may waive counsel unless the court has first explained the nature and meaning of a petition for the termination of parental rights. Unless the appointment of counsel is required under section 46b-136, the court may appoint counsel to represent or appear on behalf of any child in a hearing held under this section to speak on behalf of the best interests of the child. If the respondent parent is unable to pay for his own counsel or if the child or the parent or guardian of the child is unable to pay for the child's counsel, in the case of a superior court matter, the reasonable compensation of counsel appointed for the respondent parent or the child shall be established by, and paid from funds appropriated to, the judicial department and, in the case of a probate court matter, the reasonable compensation of counsel appointed for the respondent parent or the child shall be established by the probate court administrator and paid from the probate court administration fund.

"(c) The court shall, if a claim for paternity has been filed in accordance with section 46b-172a, continue the hearing under the provisions of this section until the claim for paternity is adjudicated, provided the court may

the termination of the parental rights of the mother of an infant based upon the mother's prenatal conduct of injecting cocaine; and (2) General Statutes

combine the hearing on the claim for paternity with the hearing on the termination of parental rights petition.

"(d) Upon finding at the hearing or at any time during the pendency of the petition that reasonable cause exists to warrant an examination, the court, on its own motion or on motion by any party, may order the child to be examined at a suitable place by a physician, psychiatrist or licensed clinical psychologist appointed by the court. The court may also order examination of a parent or custodian whose competency or ability to care for a child before the court is at issue. The expenses of any examination if ordered by the court on its own motion shall be paid for by the petitioner or, if ordered on motion by a party, shall be paid for by the party moving for such an examination unless such party or petitioner is unable to pay such expenses in which case, in a superior court matter, they shall be paid for by funds appropriated to the judicial department and in a probate court matter, they shall be paid from the probate court administration fund. The court may consider the results of the examinations in ruling on the merits of the petition.

"(e) (1) The court may, and in any contested case shall, request the commissioner of children and youth services or any child-placing agency licensed by the commissioner to make an investigation and written report to it, within ninety days from the receipt of such request. The report shall indicate the physical, mental and emotional status of the child and shall contain such facts as may be relevant to determine whether the proposed termination of parental rights will be for the welfare of the child, including the physical, mental, social and financial condition of the natural parents, and any other factors which the commissioner or such agency finds relevant to determine whether the proposed termination will be for the welfare of the child. (2) If such a report has been requested, upon the expiration of such ninety-day period or upon receipt of the report, whichever is earlier, the court shall set a day for a hearing not more than thirty days thereafter. The court shall give reasonable notice of such adjourned hearing to all parties to the first hearing, including the child, if over fourteen years of age, and to such other persons as the court shall deem appropriate. (3) The report shall be admissible in evidence, subject to the right of any interested party to require that the person making it appear as a witness, if available, and subject himself to examination.

"(f) At the adjourned hearing or at the initial hearing where no investigation and report has been requested, the court may approve the petition terminating the parental rights and may appoint a guardian of the person of the child, or if the petitioner requests, the court may appoint a statutory parent, if it finds, upon clear and convincing evidence that the termination is in the best interest of the child and that, with respect to any

§ 45a-717 (f) (3); see footnote 1, supra; as applied to the facts of this case, permits the termination of the same parental rights upon the basis of an absence of an ongo-

consenting parent, such parent has voluntarily and knowingly consented to termination of his parental rights with respect to such child or that, with respect to any nonconsenting parent, over an extended period of time which, except as provided in subsection (g) of this section, shall not be less than one year: (1) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; or (2) the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights; or (3) there is no ongoing parent child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent child relationship would be detrimental to the best interests of the child. If the court denies a petition for consent termination of parental rights, it may refer the matter to an agency to assess the needs of the child, the care the child is receiving, and the plan of the parent for the child.

"(g) The court may waive the requirement that one year expire prior to the termination of parental rights if it finds from the totality of the circumstances surrounding the child that such a waiver is necessary to promote the best interest of the child.

"(h) Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (3) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (4) the age of the child; (5) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visi-

ing parent-child relationship between the mother and the infant. The respondent mother[2] appeals, upon our grant of certification, from the judgment of the Appellate Court affirming the judgment of the trial court that granted the petition of the commissioner of children and youth services (petitioner) for termination of the respondent's parental rights with respect to her daughter, Valerie D. (child).[3] The trial court judgment rested on two alternative bases: (1) certain prenatal conduct of the respondent, namely, intravenous injection of cocaine, caused "serious physical injury to [the] child" that constituted "acts of parental commission or omis-

ations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (6) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.

"(i) If the parental rights of only one parent are being terminated, the remaining parent shall be sole parent and, unless otherwise provided by law, guardian of the person.

"(j) Consent for termination of the parental rights of one parent does not diminish the parental rights of the other parent of the child, nor does it relieve the other parent of the duty to support the child.

"(k) In the case where termination of parental rights is granted based on consent, the guardian of the person or statutory parent shall report to the court within ninety days on a case plan, as defined by the Federal Child Welfare Act of 1980, for the child. At least every six months thereafter, a report shall be made to the court on the implementation of the plan. The court shall review the plan for the child no less than once a year until such time as any proposed adoption plan has become finalized."

[2] The father of the infant has not appealed from the judgment of the trial court terminating his parental rights with respect to the infant involved.

[3] Our grant of certification; see In re Valerie D., 221 Conn. 901, 600 A.2d 1029 (1992); referred to General Statutes § 17a-112, rather than General Statutes § 45a-717, for the statutory basis for termination of parental rights in this case. Section § 17a-112 governs such termination regarding a child previously committed to the custody of the commissioner of children and youth services. In this case, however, there were coterminous petitions for such a commitment and for termination of parental rights, a procedure authorized by § 17a-112 (e). Under that procedure, the court in terminating parental rights does so pursuant to § 45a-717. See General Statutes § 17a-11º (e). Although the petitioner in her pleadings relied on General

sion sufficient for the termination of parental rights," within the meaning of § 45a-717 (f) (2); and (2) there was "no ongoing parent child relationship" between the respondent and the child, and "to allow further time for the establishment . . . of [such] parent child relationship would be detrimental to the best interests of the child," within the meaning of § 45a-717 (f) (3).

The respondent claims that the judgment of the Appellate Court should be reversed because: (1) § 45a-717 (f) (2) does not permit termination of parental rights based upon the prenatal conduct of the mother; (2) if § 45a-717 (f) (2) does permit such a termination of parental rights, it violates the respondent's right to due process of law and equal protection of the laws

Statutes § 17-43a, the statutory predecessor to § 17a-112, both the trial court and the Appellate Court relied on § 45a-717. In any event, the provisions governing termination of such rights under both statutes are identical to each other. For purposes of accuracy, however, we refer herein to the provisions of § 45a-717.

Our certification to appeal, amended to reflect the proper statutory sections, was as follows: "On consideration of the petition by the respondent mother for certification to appeal from the Appellate Court (25 Conn. App. 586), it is hereby ordered that said petition be, and the same is hereby granted as to the following issues:

"1. Under the facts of this case, do General Statutes §§ 46b-120 and [45a-717 (f) (2) and (3)] permit a termination of parental rights based upon the prenatal conduct of the respondent mother?

"2. If the answer to question 1 is yes, did such a termination:

"(a) violate the mother's right to due process of law under the federal or state constitution; or

"(b) constitute impermissible discrimination on the basis of sex, in violation of the equal protection clause of the federal or state constitution?

"3. Under the facts of this case, was the termination of parental rights, on the ground that there was no ongoing parent-child relationship, unconstitutional on the basis that the state was responsible for the lack of such relationship?

"4. Did the Appellate Court properly conclude that the record supports the trial court's finding that there was no ongoing parent-child relationship?

"5. Under the facts of this case, did the trial court's determination to waive the one-year waiting period under General Statutes § [45a-717 (g)] violate the respondent mother's constitutional right to due process under the federal or state constitution?"

under the federal and state constitutions; (3) under the facts of this case, the termination of the respondent's parental rights upon the basis of an absence of an ongoing parent-child relationship was unconstitutional because the state was responsible for the absence of such a relationship; (4) the record does not support the finding of the trial court that there was no ongoing parent-child relationship; and (5) the trial court used an improper standard in waiving the one year requirement provided by § 45a-717 (f)[4] and no such waiver was justified under the facts of this case. We agree with the respondent's first claim, namely, that § 45a-717 (f) (2), properly construed, does not permit termination of parental rights based upon the mother's prenatal conduct. With respect to the respondent's third claim, we agree that § 45a-717 (f) (3), as applied to the facts of this case, does not permit the state to terminate the respondent's parental rights upon the basis that she had no ongoing parent-child relationship with her child, but we reach that conclusion by virtue of statutory interpretation rather than constitutional analysis.[5] Accordingly, we reverse the judgment of the Appellate Court.

The child was born to the respondent on July 26, 1989, in Bristol Hospital. On August 1, 1989, while the child was still in the hospital, the petitioner filed in the Superior Court: (1) a petition for an order of temporary care and custody of the child, pursuant to General Statutes § 46b-129 (b),[6] upon the basis of an affidavit of the

[4] Pursuant to General Statutes § 45a-717 (f), the court must find that the ground of termination has existed for not less than one year. The court may, however, waive the one year requirement pursuant to § 45a-717 (g) if "such a waiver is necessary to promote the best interest of the child."

[5] These conclusions render it unnecessary to reach the remaining claims of the respondent.

[6] General Statutes § 46b-129 provides: "COMMITMENT OF CHILD OR YOUTH. PETITION FOR NEGLECTED, UNCARED-FOR, DEPENDENT CHILD OR YOUTH. (a) Any selectman, town manager, or town, city, or borough welfare depart-

child's pediatrician that the respondent's use of cocaine within hours prior to beginning labor put the child "in great risk of life-threatening medical complications"

ment, any probation officer, the Connecticut Humane Society, or the commissioner of human resources, the commissioner of children and youth services or any child-caring institution or agency approved by the commissioner of children and youth services, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the superior court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, except as otherwise provided in subsection (e) of section 17a-112, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 46b-128, and said court shall further give notice to the petitioner and to the commissioner of children and youth services of the time and place when the petition is to be heard not less than fourteen days next preceding the hearing in question.

"(b) If it appears from the allegations of the petition and other verified affirmations of fact accompanying the petition, or subsequent thereto, that there is reasonable cause to find that the child's or youth's condition or the circumstances surrounding his care require that his custody be immediately assumed to safeguard his welfare, the court shall either (1) issue an order to the parents or other person having responsibility for the care of the child or youth to show cause at such time as the court may designate why the court shall not vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing on the petition, or (2) vest in some suitable agency or person the child's or youth's temporary care and custody pending a hearing upon the petition which shall be held within ten days from the issuance of such order on the need for such temporary care and custody. The service of such orders may be made by any officer authorized by law to serve process, or by any probation officer appointed in accordance with section 46b-123, investigator from the department of administrative services, state police officer or indifferent person. The expense for any temporary care and custody shall be paid by the town in which such child or youth is at the time residing, and such town shall be reimbursed therefor by the town found liable for his support, except that where a state agency has filed a petition pursuant to the provisions of subsection (a) of this section, the agency shall pay such expense.

and that this conduct constituted "intentional and severe parental neglect"; (2) a petition for commitment of custody of the child to the petitioner, pursuant to

"(c) When a petition is filed in said court for the commitment of a child or youth, the commissioner of children and youth services shall make a thorough investigation of the case and shall cause to be made a thorough physical and mental examination of the child or youth if requested by the court. The court after hearing on the petition and upon a finding that the physical or mental ability of a parent or guardian to care for the child or youth before the court is at issue may order a thorough physical or mental examination, or both, of the parent or guardian whose competency is in question. The expenses incurred in making such physical and mental examinations shall be paid as costs of commitment are paid.

"(d) Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the commissioner of children and youth services for a maximum period of eighteen months, unless such period is extended in accordance with the provisions of subsection (e) of this section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person found to be suitable and worthy of such responsibility by the court. The commissioner shall be the guardian of such child or youth for the duration of the commitment, provided the child or youth has not reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, provided such child or youth has not reached the age of twenty-one, by consent of such youth, or until another guardian has been legally appointed, and in like manner, upon such vesting of his care, such other public or private agency or individual shall be the guardian of such child or youth until he has reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, until such child or youth has reached the age of twenty-one years or until another guardian has been legally appointed. Said commissioner may place any child or youth so committed to him in a suitable foster home or in the home of a person related by blood to such child or youth or in a licensed child-caring institution or in the care and custody of any accredited, licensed or approved child-caring agency, within or without the state, provided a child shall not be placed outside the state except for good cause and unless the parents of such child are notified in advance of such placement and given an opportunity to be heard, or in a receiving home maintained and operated by the commissioner of children and youth services. In placing such child or youth, said commissioner shall, if possible, select a home, agency, institution or

§ 46b-129 (a); see footnote 6, supra; upon the bases that the child was neglected, uncared for and abused; and (3) a coterminous petition for termination of the respon-

person of like religious faith to that of a parent of such child or youth, if such faith is known or may be ascertained by reasonable inquiry, provided such home conforms to the standards of said commissioner.

"(e) Ninety days before the expiration of each eighteen-month commitment made in accordance with the provisions of subsection (d) of this section and each extension made pursuant to the provisions of this subsection, the commissioner of children and youth services shall petition the court either to (1) revoke such commitment, in accordance with the provisions of subsection (g) of this section, or (2) terminate parental rights in accordance with the provisions of section 17a-112, or (3) extend the commitment beyond such eighteen-month period on the ground that an extension is in the best interest of the child. The court shall give notice to the parent, parents or guardian and to the child or youth at least fourteen days prior to the hearing on such petition. Upon finding that an extension is in the best interest of the child, the court may extend the commitment for a period of eighteen months.

"(f) The commissioner of children and youth services shall pay directly to the person or persons furnishing goods or services determined by said commissioner to be necessary for the care and maintenance of such child or youth the reasonable expense thereof, payment to be made at intervals determined by said commissioner; and the comptroller shall draw his order on the treasurer, from time to time, for such part of the appropriation for care of committed children or youth as may be needed in order to enable the commissioner to make such payments. Said commissioner shall include in his annual budget a sum estimated to be sufficient to carry out the provisions of this section. Notwithstanding that any such child or youth has income or estate, the commissioner may pay the cost of care and maintenance of such child or youth. The commissioner may bill to and collect from the person in charge of the estate of any child or youth aided under this chapter, including his decedent estate, or the payee of such child's or youth's income, the total amount expended for care of such child or youth or such portion thereof as any such estate or payee is able to reimburse.

"(g) Any court by which a child or youth has been committed pursuant to the provisions of this section may, upon the application of a parent, including any person who acknowledges before said court paternity of a child or youth born out of wedlock, or other relative of such child or youth, the selectman or any original petitioner, or a licensed child-caring agency or institution approved by the commissioner, or said commissioner, and while such child or youth is under the guardianship of said commissioner, upon hearing, after reasonable notice to said commissioner, and, if said commissioner made the application, after reasonable notice to such parent, relative, original petitioner, selectman or child-caring agency or institution,

dent's parental rights with respect to the child, pursuant to General Statutes § 17a-112 (e),[7] upon the basis that, due to the respondent's use of cocaine throughout the pregnancy resulting in the child having been born "drug addicted" and "suffering from with-

upon finding that cause for commitment no longer exists, revoke such commitment, and thereupon such guardianship and all control of said commissioner over such child or youth shall terminate. The court may further revoke the commitment of any child or youth upon application by the commissioner or by the child or youth concerned and after reasonable notice to the parties affected upon a finding that such revocation will be for the best interest and welfare of such child or youth. No hearing shall be held for such reopening and termination of commitment or transfer of commitment more often than once in six months, except upon the application of said commissioner.

"(h) Upon service on the parent, guardian or other person having control of the child or youth of any order issued by the court pursuant to the provisions of subsections (b) and (d) of this section, the child or youth concerned shall be surrendered to the person serving the order who shall forthwith deliver the child or youth to the person, agency, department or institution awarded custody in such order. Upon refusal of the parent, guardian or other person having control of the child or youth to surrender the child or youth as provided in the order, the court may cause a warrant to be issued charging the parent, guardian or other person having control of the child or youth with contempt of court. If the person arrested is found in contempt of court, the court may order such person confined until he purges himself of contempt, but for not more than six months, or may fine such person not more than five hundred dollars, or both.

"(i) A foster parent shall have standing for the purposes of this section in superior court in matters concerning the placement or revocation of commitment of a foster child living with such parent. A foster parent shall receive notice of any application to revoke commitment or any hearing on such application."

[7] General Statutes § 17a-112 (e) provides: "Any petition brought by the commissioner of children and youth services to the superior court, pursuant to subsection (a) of section 46b-129, may be accompanied by a petition for termination of parental rights filed in accordance with this section with respect to such child, notwithstanding that such child has not been committed to the commissioner of children and youth services. Notice of the hearing on such petitions shall be given in accordance with sections 45a-716 and 45a-717. The superior court, after hearing, in accordance with the provisions of subsection (b) of this section, may, in lieu of granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45a-717."

drawal," the child "had been denied by reason of act or acts of commission or omission, the care, guidance or control necessary for [her] physical, educational, moral or emotional well being," and that she had "sustained a nonaccidental or inadequately explained serious injury." On the same date, the trial court granted, ex parte, the petition for temporary custody.[8] On October 4, 1989, the petitioner amended the petition to add, as grounds for termination of parental rights, abandonment and a lack of an ongoing parent-child relationship.[9]

The trial court heard evidence on the coterminous petitions for custody and termination of parental rights on November 8, 1989, December 13, 1989, January 17, 1990, and February 21, 1990. On March 28, 1990, the court rendered an oral decision from the bench granting the coterminous petitions.[10] With respect to the petition for termination of parental rights, the court found proven by clear and convincing evidence that: (1) by the respondent's intravenous use of cocaine in the last stages of pregnancy, the child had been denied by reason of acts of parental commission or omission the care, guidance or control necessary for her physical, educational, moral or emotional well-being; and (2) as of the adjudication date of November 8, 1989, there was no ongoing parent-child relationship between the respondent and the child, and it would be detrimental to the child's best interest to allow further time for

---

[8] The court also ordered prompt service on the respondent of all three petitions, and set dates for a hearing on the continued need for temporary custody and for the hearing on the coterminous petitions for commitment and for termination of parental rights. At the hearing on the order of temporary custody, the respondent agreed to the continuance of that order.

[9] On November 8, 1989, the petitioner further amended the petition to reflect the correct last name of the child.

[10] The respondent has not challenged on appeal the judgment granting the petition for commitment of the custody of the child to the petitioner.

such a relationship to be established.[11] Having considered the statutory factors listed in § 45a-717 (h); see footnote 1, supra; and all the circumstances leading up to the dispositional date of February 21, 1990, which was the last date of the evidentiary hearings, the court found by clear and convincing evidence that it was in the child's best interest to be placed forthwith in permanent adoption. Accordingly, the court terminated the respondent's parental rights and appointed the petitioner as the child's statutory parent for the purpose of placing her in adoption. On July 24, 1990, the trial court issued a written articulation of its oral decision.

The Appellate Court affirmed the judgment of the trial court. *In re Valerie D.*, 25 Conn. App. 586, 595 A.2d 922 (1991). That court held that: (1) a judgment of "termination of parental rights can be supported solely by evidence of a mother's prenatal conduct"; id., 593; and (2) there was sufficient evidence to support the trial court's findings that there was no ongoing parent-child relationship between the child and the respondent, and that it would be detrimental to the child's best interest to allow further time for the establishment of such a relationship. Id., 594A–95. This appeal followed.

I

The respondent claims first that § 45a-717 (f) (2), properly construed, does not permit the termination of parental rights based upon the prenatal conduct of the mother. We agree.

The record discloses the following facts pertinent to this claim.[12] The respondent, who was born August 4, 1969, began using drugs at age eleven. At age fifteen

[11] The trial court concluded that the petitioner had not proven the ground of abandonment. The petitioner has not challenged that conclusion on appeal.

[12] In its written articulation, the trial court made detailed findings of fact. We agree in part with the respondent that certain of those facts are not

she met the child's father, John M., and at age sixteen she left school and home and began living with him. Thereafter, they both began injecting cocaine intravenously. In 1987, the respondent became pregnant with her first child, Amanda. When, during the fourth month of pregnancy, she disclosed her history of drug abuse to her physician, he warned her of its impact on her unborn child and gave her literature on the subject. She was able to discontinue the use of cocaine almost completely during that pregnancy, and Amanda was born, symptom free, on May 12, 1988. Three months later, however, she resumed using cocaine, by smoking and intravenous injection, two to five times per week.

In October, 1988, the respondent became pregnant with Valerie, but did not visit her physician until March, 1989, when he again warned her of the problems that her substance abuse could cause to her unborn child. By this time, however, the respondent had become addicted to cocaine and was unable to stop using it. Although the respondent informed her physician that she would continue prenatal care at the Bristol Hospital clinic because she had no medical insurance, her physician learned in July, when the respondent returned to him, that she had not gone to the clinic until June 5, 1989. The court further noted that, under normal circumstances, a pregnant woman should be seen monthly for the first twenty-eight weeks, and more frequently for a high risk pregnancy posed by a drug-abusing woman.

On June 19, 1989, John M.'s probation officer visited the home, where he observed marijuana and drug paraphernalia. Both parents were arrested. Amanda

---

supported by the evidence. The statement of facts, therefore, consists of those that were properly found by the trial court, supplemented, however, by those that were undisputed at trial.

was taken to Bristol Hospital, and the parents were advised to place her in foster care while they entered treatment for their admitted cocaine addiction. A hospital social worker advised the respondent of the risks to a fetus from intravenous cocaine use. After the parents refused voluntary placement of Amanda and drug treatment for themselves, the petitioner filed a neglect petition regarding Amanda and secured an order of temporary custody in order to remove her from the hospital and place her in foster care.

On July 26, 1989, when the parents were scheduled for a continued hearing on the neglect petition regarding Amanda, they telephoned and informed the court that the respondent's water had broken, that she was about to deliver and that they were on their way to the hospital. Instead, at approximately 1 p.m., the respondent intravenously injected a quarter gram of cocaine and did not arrive at the hospital until approximately 9 p.m. The child was born approximately one hour later.

During the birth process, the child had passed meconium;[13] this was the result of stress to the child from a precipitous delivery that resulted, in turn, from the respondent's injection of cocaine while she was leaking amniotic fluid and expecting to go into labor. In such a case, there is a risk that the child can aspirate the meconium, causing life-threatening respiratory problems. An aggressive suctioning procedure was used to guard against that risk, and it was found that the child had not aspirated any meconium.[14]

[13] Meconium is the stool of an unborn child.

[14] The trial court found that "[t]he greatest danger to [the child's] survival was the inhalation of meconium . . . which was inhaled in the birth process, a condition that can be severely life-threatening and might have proven fatal. The most common cause for this condition is stress to the baby from a precipitous delivery which here most probably had resulted from the intravenous injection of cocaine during labor. . . . Only with vigorous and aggressive suctioning of her air passages before being fully delivered was Valerie able to start breathing and avoid . . . 'potential severe

At birth the child was pale, had poor muscle tone and required oxygen. While the child was in the hospital, cocaine metabolites were found in her urine, and she

respiratory problems'. . . . [T]he most medically probable explanation for this life-threatening condition [was] the mother's use of cocaine 'when she was leaking amniotic fluid and expecting to go into labor' . . . .'' Based upon its perception from the evidence that the child had aspirated the meconium, the court also found that, as a result of the respondent's injection of cocaine on the day of the child's birth, "[s]tress from cocaine use at this stage precipitated the birth resulting in the baby's aspiration of meconium which only drastic and aggressive suctioning during the birth process prevented from fatality." The court also found that "the intravenous injection of cocaine into the bloodstream of the mother . . . after [the] initiation of labor, resulted in a tangible denial of proper care and attention physically . . .'' and that "Valerie almost died as a direct result of the mother's injection of cocaine after labor had begun." Finally, the court concluded that "Valerie suffered serious, life-threatening, physical injury at the instant of her birth because of her mother's deliberate intravenous injection of cocaine after beginning labor."

These findings are flawed. First, the record is clear that the respondent injected the cocaine after her amniotic fluid had begun to leak, but several hours before the onset of labor. Thus, it was inaccurate to state that the respondent injected cocaine "after beginning labor."

More fundamentally, there was no evidence that the child had aspirated the meconium. Indeed, the evidence was clearly to the contrary. Although the child's pediatrician attributed the precipitous labor and the child's passage of meconium to the respondent's cocaine use, he also testified that the obstetrician suctioned the child's mouth before delivering the entire body and that when the child did breathe there had been no meconium aspirated. There was, therefore, no evidence from which the trial court could have inferred that the baby aspirated "meconium which only drastic and aggressive suctioning during the birth process prevented from fatality,'' or that the child "almost died as a direct result of the mother's injection of cocaine after labor had begun."

To the extent, therefore, that the trial court's conclusion that the child "suffered serious, life-threatening, physical injury at the instant of her birth" rested on the antecedent finding that the child had aspirated meconium, that conclusion is not supported by the record. The position of the petitioner on appeal does not, however, rest on those flawed findings.

Also flawed are the trial court's findings, and the petitioner's reliance thereon, regarding the child's need for two hospitalizations for pneumonia in September, 1989. There was no evidence connecting those hospitalizations with the respondent's cocaine use.

In this connection, the trial court also concluded, not on the basis of any evidence but on the basis of its judicial notice of largely unspecified studies,

went through cocaine withdrawal. At times, she was extraordinarily jittery and shaky, had a piercing cry, was unable to make eye contact, and required special care, such as swaddling, vertical rocking and elimination of all stimuli.

The petitioner argues that "[a]s a result of the mother's intravenous injection of cocaine when on the verge of labor, the child was born into this world under life-threatening circumstances." This argument is based on the testimony of the pediatrician that the passage of meconium prior to delivery posed a *risk* of aspiration that, had it occurred, would have caused life-threatening respiratory problems.

The petitioner also argues that "the child *was* seriously affected at birth by her mother's cocaine use." (Emphasis in original.) The following evidence forms the basis of this argument. The presence of the meconium, the child's respiratory distress, and the precipitous delivery were caused by the respondent's cocaine use. The child's heart rate had fallen just prior to delivery, and she was born cyanotic, required oxygen, and had depressed Apgar scores, an "evaluation of a newborn infant's physical status by assigning numerical values (0 to 2) to each of five criteria: heart rate, respiratory effort, muscle tone, response to stimulation, and skin color; a score of 10 indicates the best possible condition." Stedman's Medical Dictionary (24th Ed.). The child's urine indicated the presence of cocaine metabolites, and she went through withdrawal. Fur-

that "[c]ocaine babies are at risk for years of physical, neurological and intellectual problems, and need an extraordinarily sensitive degree of responsive, consistent, stable parenting," and that "[c]urrent studies on 'cocaine babies' suggest neurological, intellectual and emotional deficits directly ascribable to maternal cocaine use during pregnancy may be anticipated as they grow older." On appeal, the respondent and the amici claim that these conclusions are not borne out by the medical literature to date. Since we have assumed that the evidence relied on by the petitioner would constitute serious physical injury, we need not resolve that debate.

thermore, there was evidence that cocaine restricts the blood vessels, and may interfere with mental development. There was also evidence that prenatal drug abuse may ultimately result in learning disability, central nervous system damage, lens deformities, hyperactivity, and an increased risk of sudden infant death syndrome.

We need not decide in this case whether this evidence would support a finding of "serious physical injury to a child" within the meaning of § 45a-717 (f) (2), if the parental conduct that yielded these conditions and risks had taken place immediately after, rather than before, delivery. We assume that it would support such a finding, particularly where the child is a newborn infant, and we treat this case accordingly.

Based upon this evidence, the trial court rendered an adjudication, as of November 8, 1989, the date that the petition had been last amended; see footnote 9, supra; that the child had been denied "by acts of parental commission or omission the care, guidance or control necessary for physical, educational and emotional well-being." The court specifically found that there had been " '[n]onaccidental . . . serious physical injury to [the] child . . . constitut[ing] . . . acts of parental commission or omission sufficient for the termination of parental rights.' " See General Statutes § 45a-717 (f) (2). In support of this conclusion, the trial court reasoned: "Valerie suffered serious, life-threatening, physical injury at the instant of her birth because of her mother's intravenous injection of cocaine after beginning labor. This ground would apply without question to parents who, an instant *after* birth, injected cocaine into the bloodstream of a newborn. The injection of the drug into the bloodstream of a baby about to be born should have no different consequences." (Emphasis in original.) It is the validity of this conclusion that forms the core of the first issue in this case.

It is important to note at the outset what this case does not involve. It does not involve the propriety of the trial court's order committing custody of the child to the petitioner. The respondent has not challenged that order at any time during the entire course of this litigation. Moreover, "questions concerning the ultimate custodial placement of the child may not be intermingled with the issues of termination." *In re Jessica M.,* 217 Conn. 459, 466, 586 A.2d 597 (1991). Nor does this case involve a determination of whether it would be in the child's best interests to terminate the respondent's parental rights in order to substitute another, more suitable parent. Our statutes and caselaw make it crystal clear that the determination of the child's best interests comes into play only *after* statutory grounds for termination of parental rights have been established by clear and convincing evidence.[15] We also note that we do not endorse the moral quality of the conduct of the respondent in this case. Certainly no one approves of the intravenous injection of cocaine by a pregnant woman, who had been warned of the risks to her fetus, at any time during her pregnancy let alone just before the onset of labor. Nor, on the other hand, are we here to condemn her for succumbing to what may well have

---

[15] "As a matter of statutory fiat, consideration of the best interests of the child cannot vitiate the necessity of compliance with the specified statutory standards for termination. *In re Barbara J.,* 215 Conn. 31, 45, 574 A.2d 203 (1990); *In re Luis C.,* 210 Conn. 157, 165, 554 A.2d 722 (1989); *In re Juvenile Appeal (Anonymous)[ v. Commissioner of Children & Youth Services,* 177 Conn. 648, 671–72, 420 A.2d 875 (1979)]; see also O. Ketcham & R. Babcock, 'Statutory Standards for the Involuntary Termination of Parental Rights,' 29 Rutgers L. Rev. 530, 539 (1976)." *In re Jessica M.,* 217 Conn. 459, 465–66, 586 A.2d 597 (1991). Furthermore, "General Statutes [§ 45a-717 (f)] expressly requires the court to find, in addition to the existence of an enumerated statutory ground for termination, that such termination is in the best interests of the child. This statutory element was added to § [45a-717 (f)] by Public Acts 1983, No. 83-478, § 2. Both its plain language and its available legislative history indicate that the legislature intended this provision to serve as an additional, not an alternative, requirement for the termination of parental rights." Id., 466 n.5.

been the unyielding demands of her addiction. Our task, rather, is to determine whether the legislature, in enacting § 45a-717 (f) (2), intended it to apply in a case such as this. We do not believe that it did.

Section 45a-717 (f) (2) provides, in pertinent part, that the court may approve a petition for termination of parental rights "if it finds, upon clear and convincing evidence that . . . the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for [the child's] physical, educational, moral or emotional well-being. Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ." See footnote 1, supra. It is axiomatic that the process of statutory interpretation involves a reasoned search for the intention of the legislature. *Lauer* v. *Zoning Commission*, 220 Conn. 455, 459–60, 600 A.2d 310 (1991). The question posed by the facts of this case is whether the legislature intended this language to contemplate termination of parental rights based upon prenatal conduct—even prenatal conduct committed shortly before the onset of labor—that results in harm to the child upon its birth.

The scope of this statute is ambiguous when applied to the facts of this case. The statute rests on "two distinct and often contradictory interests [of the child]. The first is a basic interest in safety; the second is the important interest . . . in having a stable *family* environment." (Emphasis in original.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 287, 455 A.2d 1313 (1983). Indeed, the petitioner concedes with appropriate candor that the "statute is silent as to when the [parental commission or omission] must occur." In light of this ambiguity, we must examine the constitutional background, the language and the structure of the stat-

ute, as well as the legislative history relevant to its meaning. *Lauer* v. *Zoning Commission,* supra, 460. These well settled principles of statutory construction constrain us to conclude that the parental conduct justifying termination of parental rights pursuant to § 45a-717 (f) (2) must occur after birth and that the statute does not contemplate termination of parental rights upon the basis of prenatal conduct.

"[T]he termination of parental rights is defined, in General Statutes § 45-61b (g) [now § 45a-707 (g)], as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . It is, accordingly, a most serious and sensitive judicial action. *Anonymous* v. *Norton,* 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Although the severance of the parent-child relationship may be required under some circumstances, the United States Supreme Court has repeatedly held that the interest of parents in their children is a fundamental constitutional right that undeniably warrants deference and, absent a powerful countervailing interest, protection. *Stanley* v. *Illinois,* 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972); see also *In re Juvenile Appeal (83-CD),* [supra, 295] (noting that it is both a fundamental right and the policy of this state to maintain the integrity of the family). Termination of parental rights does not follow automatically from parental conduct justifying the removal of custody. The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. *Santosky* v. *Kramer,* 455 U.S. 745, 753, 102 S. Ct. 1388,

71 L. Ed. 2d 599 (1982)." (Internal quotation marks omitted.) *In re Jessica M.,* supra, 464–65.

Thus, in construing § 45a-717 (f) (2), which operates "in the delicate realm of parent-child relationships, courts should prefer that construction which minimizes state intervention. . . ." (Internal quotation marks omitted.) *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Cildren & Youth Services,* 177 Conn. 648, 662, 420 A.2d 875 (1979). In this realm, therefore, § 45a-717 (f) (2) should be read with a "preference for nonintrusion" by the state. Id. Because of their "fundamental nature," statutes "authorizing state intrusion into the area of parental rights" require "the strictest level of judicial scrutiny." *In re Juvenile Appeal (84-BC),* 194 Conn. 252, 257 n.9, 479 A.2d 1204 (1984); see also *In re Juvenile Appeal (83-CD),* supra, 284 (courts must keep in mind constitutional limitations imposed on state when it undertakes coercive intervention in family affairs).

Strict construction of a statute permitting the termination of parental rights is consistent with our traditional "[i]nsistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption can occur [and] is not inconsistent with concern for the best interests of the child." (Internal quotation marks omitted.) *In re Jessica M.,* supra, 466.[16] In sum, in light of the ambiguity and uncertainty regarding the scope of § 45a-717 (f) (2), as applied to the facts of this case, the statute must, con-

---

[16] We recognize that General Statutes § 45a-706 provides that "[t]he provisions of sections . . . 45a-715 to 45a-718, inclusive . . . shall be liberally construed in the best interests of any child for whom a petition has been filed under said sections." Nonetheless, because of the constitutional nature of the protection of the parent-child relationship, we have consistently adhered to the principle of strict construction of the termination statutes. See *In re Jessica M.,* 217 Conn. 459, 586 A.2d 597 (1991); *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* 177 Conn. 648, 420 A.2d 875 (1979).

sistent with its constitutional implications, be construed strictly and narrowly, rather than generously and broadly.

With this background in mind, we turn first to the language of the statute in order to determine whether the legislature intended it to encompass prenatal conduct. For purposes of § 45a-717, " '[p]arent' means a natural or adoptive parent." General Statutes § 45a-707 (e). " 'Child' means any person under sixteen years of age." General Statutes § 46b-120.[17] The ordinary usage of the term "parent," insofar as it applies to the female, suggests that, unless the context requires otherwise, it means "one [who] . . . brings forth offspring." Webster's Third New International Dictionary. Thus, in ordinary parlance, until the child in this case was born, or was "brought forth," the respondent was not her "parent" and the conduct of the respondent with respect to her was not "parental" conduct. Similarly, the definition of "child" as a person "under sixteen years of age" suggests a limitation on the applicability of that definition to a person who has been born, since that is the ordinary beginning point of one's "age." Thus, until the moment of birth, Valerie was not a "child" within the meaning of § 45a-717 (f) (2) and, therefore, the "act . . . of parental commission" that took place before that moment cannot be considered to be parental conduct that "denied [her] . . . the care . . . necessary for [her] physical . . . well-being." Cf. *Burns* v. *Alcala,* 420 U.S. 575, 95 S. Ct. 1180, 43 L. Ed. 2d 469 (1975) (based on axiom that statutory words are to be given ordinary meaning

[17] Although there is no statutory definition of "child" specifically applicable to General Statutes § 45a-717, and although General Statutes § 46b-120 is in a different chapter of the General Statutes, we consider the statutory definition contained in § 46b-120 to apply to § 45a-717, because § 46b-120 provides: "The terms used in this chapter shall, in its interpretation *and in the interpretation of other statutes,* be defined as follows . . . ." (Emphasis added.)

absent persuasive reasons to contrary, "child" as used in § 406 (a) of federal Social Security Act means individual already born, with existence separate from mother).

It is true, of course, that one can be considered, semantically, to be the "parent" of a child yet to be born; in such a case, the word "child" would be considered to include reference to an unborn child.[18] It is also true that such a broad, rather than narrow, construction would favor the petitioner in this case. Faced with two plausible constructions of the statutory language, however, we are compelled by its constitutional backdrop to choose the narrow construction, and to limit the reach of the language accordingly.

We took the opposite approach in *Crook* v. *Academy Drywall Co.*, 219 Conn. 28, 591 A.2d 429 (1991), where we held that, for purposes of the Workers' Compensation Act, an employee was entitled to a dependency allowance for a child conceived before but born after the date of the employee's injury. Id., 28–30. In that case, we rested our holding that a child en ventre sa mere was a child " 'under eighteen years of age,' " within the meaning of the Workers' Compensation Act; id., 29 n.1, quoting General Statutes § 31-308b (1); on the established principle that the act "is remedial in nature and that it should be broadly construed . . . ." (Internal quotation marks omitted.) Id., 32. The established principles that govern construction of § 45a-717, however, require that it be read narrowly and strictly, and require further that, absent clear indication to the contrary from the legislature, it be read so as to apply only to postnatal parental conduct.

This conclusion is buttressed by the use of the terms "parent" and "child" throughout § 45a-717. Ordinar-

---

[18] Indeed, Webster defines "child" as "an unborn or recently born human being: FETUS, INFANT, BABY." Webster's Third New International Dictionary.

ily we read the same terms in the same statute to have the same meanings. *AirKaman* v. *Groppo,* 221 Conn. 751, 758, 607 A.2d 410 (1992). The terms "parent" and "child," as used throughout the other parts of § 45a-717 (f), clearly contemplate a child who has been born to his or her parents, and do not contemplate prenatal conduct by a pregnant woman with respect to her fetus.

Section 45a-717 (f) (1), for example, permits termination of parental rights if "[t]he child has been abandoned by the parent," and § 45a-717 (f) (3) permits termination if "there is no ongoing parent child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child . . . ." Neither of these statutory uses of the terms "parent" and "child" could conceivably involve prenatal conduct by a pregnant woman with respect to her fetus. It would, therefore, be inconsistent with the ordinary legislative use of the same or similar language within the same statutory section to permit that language to carry one meaning in one subsection but another meaning in the other two subsections. In the absence of a clear expression of an intention to do so, we will not ascribe such an intention to the legislature. Moreover, § 45a-717 (f) requires that the conduct of a parent justifying termination of her parental rights must continue "over an extended period of time which . . . shall not be less than one year," unless the one year period is waived by the court pursuant to § 45a-717 (g). The legislature could not have intended that one year requirement, which applies uniformly to all three grounds for termination under § 45a-717 (f), to apply to grounds for termination that would be based upon prenatal conduct.

Finally, we obtain guidance to the intention of the legislature in its enactment in 1990 of certain legisla-

tion addressing the question of how best to deal with the issue of substance-abusing pregnant women, and in the simultaneous rejection by the responsible legislative committee of certain other proposed legislation addressing the same question.[19] Specifically, the 1990 legislature, by adopting Substitute Senate Bill No. 197 and rejecting House Bill No. 5205, evidenced an intent to approach that issue by a program of treatment and support, and an intent to eschew giving the petitioner the authority to seek termination of parental rights based upon prenatal drug abuse.

The joint committee on public health considered and held simultaneous hearings on two bills: (1) House Bill No. 5205; and (2) Substitute Senate Bill No. 197. A principal thrust of House Bill No. 5205 was to couple mandatory testing and reporting requirements of pregnant, drug-dependent women with mandated investigations by the department of children and youth services (DCYS) so as to give DCYS explicit authority to petition for termination of parental rights based upon the prenatal drug abuse by the mother.[20] This bill, there-

[19] Ordinarily, we are reluctant to draw inferences regarding legislative intent from the failure of a legislative committee to report a bill to the floor, because in most cases the reasons for that lack of action remain unexpressed and thus obscured in the mist of committee inactivity. In this case, however, the two proposed bills took directly contrary approaches to the issue before the committee in question, the committee considered the two bills together, and the legislative history of the committee hearings is replete with testimony regarding the relative merits and demerits of the two disparate approaches. See Conn. Joint Standing Committee Hearings, Public Health, Pt. 1, 1990 Sess., pp. 233–326. Under these limited circumstances, therefore, the committee's endorsement of one bill and rejection of the other, coupled with the legislature's passage of the bill endorsed by the committee, provide a sufficient foundation for an inference regarding legislative intent. See *In re Jessica M.*, 217 Conn. 459, 472 n.10, 586 A.2d 597 (1991) (consideration of testimony in committee of individual addressing proposed enactment when such testimony "provides particular illumination for subsequent legislative actions on proposed bills").

[20] House Bill No. 5205, § 7, required any health provider having reasonable cause to believe that a pregnant woman was drug-dependent to refer

fore, would have specifically authorized what the petitioner seeks in this case.

Substitute Senate Bill No. 197 took a different approach to the issue of substance-abusing pregnant women. The principal thrust of this bill was outreach services, treatment programs, and other appropriate forms of support for pregnant substance-abusing women and their families.[21] Conspicuously absent from this bill, when compared to House Bill No. 5205, were any provisions for mandatory testing and reporting, and any provisions regarding termination of parental rights.

the woman to the department of health services for assistance in obtaining treatment services from a provider licensed by that department. It also required a toxicology test on any infant whose mother the delivering physician had reason to believe had used a controlled substance during the pregnancy. It required a report of any positive result of any such test to DCYS and, notwithstanding a negative result, a report to DCYS "if other persuasive medical evidence of prenatal exposure to a controlled substance is present." House Bill No. 5205, § 9 (b). Finally, House Bill No. 5205, § 8 (a), required DCYS immediately to investigate any such report to it, and authorized DCYS to seek custody of such infant or termination of the parent's rights regarding such infant. Any such termination proceedings were to be conducted pursuant to then General Statutes § 17-43a, now General Statutes § 17a-112, which refers to General Statutes § 45a-717. House Bill No. 5205, § 8 (b).

[21] Substitute Senate Bill No. 197, § 1 (a), established as "the policy of the state alcohol and drug abuse commission to develop and implement treatment programs of substance-abusing pregnant women of any age and their children." It required each such program to offer comprehensive services, such as: (1) education and prevention programs; (2) outreach services to enroll identified substance abusers in prenatal care and treatment programs; (3) case management services; (4) hospital care coordinating substance abuse treatment with obstetric care; (5) pediatric care aimed at neurologically, behaviorally or developmentally impaired infants; (6) child care for siblings; (7) classes on parenting skills; (8) home visitation for those who need additional support or who are reluctant to enter treatment programs; (9) access to pertinent entitlement programs; and (10) vocational training for mothers seeking entry into the job market. Substitute Senate Bill No. 197, § 1 (a). Substitute Senate Bill No. 197, § 2, also required hospitals to provide, to patients who are pregnant or who had recently given birth, information regarding entitlement programs, substance abuse programs and community-based support services.

The joint committee on public health held a hearing on the two proposed bills. Much of the testimony in favor of House Bill No. 5205 pointed to the need for its mandatory reporting requirement, and on the consequent investigation by DCYS to be followed, where appropriate, by a petition for custody or termination of parental rights.[22] On the other hand, much of the testimony opposed to House Bill No. 5205, and in favor of the contrary approach proposed by Substitute Senate Bill No. 197, focused on the perceived risk that the approach proposed by House Bill No. 5205 would drive pregnant women who have abused drugs during their pregnancies to avoid prenatal care and even hospital-based births.[23]

---

[22] For example, Representative Ann P. Dandrow, one of the drafters and sponsors of the bill, testified that "[o]fficials from the Department of Children and Youth Services have identified parental drug abuse cases as a very gray area in the law, and we really want this law to be black and white. Mandatory reporting of the birth of a drug addicted child is really an absolute must. There is no other way for the state to know which children and which mothers are at need for crucial state services without some sort of data. We propose that any physician who has a reasonable cause to believe that a mother used drugs during her pregnancy, based on a particular set of physical symptoms of the child or the mother, must report the birth of this child to DCYS.

"When DCYS receives this report, they must conduct an investigation to be sure that the child will be leaving the hospital and going into a safe environment. If DCYS has the reason to believe that the infant's safety or well-being is in jeopardy, then certainly, like any other statutes they have now, they can retain temporary custody of the child, and act as they do in the same process with any other. If the court does grant the petition for supervisory custody, the court can order placement of an infant, and they can proceed as they usually do.

"DCYS can, in the most severe cases, ask for termination of parental rights. Keep in mind, though, that DCYS already has this power *in other cases.*" (Emphasis added.) Conn. Joint Standing Committee Hearings, Public Health, Pt. 1, 1990 Sess., p. 238.

[23] Kathryn Salisbury, the executive director of the Connecticut commission on children, speaking in favor of Substitute Senate Bill No. 197 and in opposition to the testing and DCYS referral provisions of House Bill No. 5205, stated: "The word on the street is that if you use cocaine, your babies will be smaller and easier to deliver. The same grapevine warns women

who want to keep their babies, to conceal their drug use at all costs, even
if it means foregoing prenatal care, or delivering their child at home. These
myths and half-truths, must be countered with aggressive outreach educa-
tion and treatment efforts. We must give a clear and unambiguous mes-
sage that it is treatment we seek to provide, not punishment of any kind.

"Six months ago, service providers and the child advocacy community,
were united in their concern about children born to substance abusing
women. We were less clear at that time about what needed to be done.
Initially, there was some talk of universal testing, and possible mandatory
referral to DCYS or the Department of Health Services. Six months later,
and literally hundreds of conversations, meetings and consultations with
experts, we are unequivocally opposed to such measures, some of which
are included in [House Bill No. 5205]. A clear consensus has [e]merged
regarding principles for developing legislation and programs for substance
abusing women and their children. These principles have been endorsed
by a coalition for the Coalition for Children's platform, an organization rep-
resenting over 150 organizations throughout the state.

"First and foremost, the focus of any legislation must be on the provi-
sion of appropriate comprehensive services to substance abusing women
and their children. . . . The overarching principle, though, is that if we
want to reach the children, we've got to reach the moms.

"Secondly, any measures which discourage prenatal care, substance abuse
treatment or early intervention services for children, should be opposed.
This includes punitive measures, as well as measures which give even the
appearance of threat or punishment. For this reason, mandatory referral
to DCYS . . . [is] opposed. . . . Parents should only be reported to DCYS
in those cases where the child is suspected to be at risk or abused accord-
ing to the current statutory definition." Conn. Joint Standing Committee
Hearings, Public Health, Pt. 1, 1990 Sess., pp. 243-44.

Other witnesses echoed these sentiments. See, e.g., Conn. Joint Stand-
ing Committee Hearings, Public Health, Pt. 1, 1990 Sess., p. 246, remarks
of Rita Watson (Substitute Senate Bill No. 197 encourages women to seek
treatment, and does not discourage them through fear of retaliation), p. 248,
remarks of Connie Dice (pregnant substance-abusing women must have
access to comprehensive treatment and prenatal care without threat of
criminal sanctions or loss of custody of their children), pp. 255-56, remarks
of Dr. Sally Rosengrem (opposing House Bill No. 5205 because by man-
dating health care provider to report drug-dependent pregnant women, any
therapeutic relationship would be undermined and would drive pregnant
women away from prenatal care and substance abuse treatment), p. 268,
remarks of Leslie Brett (opposing House Bill No. 5205 because it would
discourage women from seeking prenatal care and drug treatment).

died in committee. Substitute Senate Bill No. 197 was passed by the General Assembly with minor amendments, and is now codified in part at General Statutes § 17a-644.[24] In speaking in the House of Representatives on Substitute Senate Bill No. 197, Representative Robert Farr stated: *"As far as I'm concerned, we ought to change our laws and we ought to make it abuse for a mother to consume drugs while she's pregnant. That's what should be done.* That would be instant intervention. That would mean reporting. I don't think we've done much with this bill. Representative Dandrow is right. We're not going to achieve anything further. Obviously with the lateness of the period, I think it's a tragedy [that] we haven't done more to change our laws. There's a real problem out there. There's a real epidemic. We haven't even begun to scratch the

[24] General Statutes § 17a-644 provides: "SUBSTANCE ABUSE TREATMENT PROGRAMS FOR PREGNANT WOMEN AND THEIR CHILDREN. (a) It shall be the policy of the state alcohol and drug abuse commission to develop and implement treatment programs for substance-abusing pregnant women of any age and their children. The commission shall seek private and public funds for such programs. Each program shall, to the extent possible and within available appropriations, offer comprehensive services, including (1) education and prevention programs in high schools and family planning clinics; (2) outreach services to identify pregnant substance abusers early and enroll them in prenatal care and substance abuse treatment programs; (3) case management services; (4) hospital care with substance abuse treatment available in coordination with obstetric services; (5) pediatric care, including therapeutic care for neurologically, behaviorally or developmentally impaired infants; (6) child care for other siblings; (7) classes on parenting skills; (8) home visitation for those who need additional support or who are reluctant to enter a treatment program; (9) access to WIC and other entitlement programs; (10) vocational training for mothers seeking entry to the job market; and (11) a housing component. To the extent possible all services shall be coordinated to be delivered from a centralized location, utilizing medical vans where available and providing transportation assistance when needed.

"(b) In addition to establishing new programs pursuant to subsection (a) of this section, the commission shall incorporate the comprehensive services set forth in subsection (a) of this section in existing treatment programs when feasible."

surface of the problem." (Emphasis added.) 33 H.R. Proc., Pt. 26, 1990 Sess., pp. 9408–9409.

Based upon this entire legislative history, we conclude that the 1990 legislature, in rejecting House Bill No. 5205 and enacting in its stead Substitute Senate Bill No. 197, was persuaded by the policy arguments of the proponents of Substitute Senate Bill No. 197 and the opponents of House Bill No. 5205 that the provisions of House Bill No. 5205 entailed significant risks that pregnant women who had used illegal drugs during their pregnancies would avoid prenatal care and substance abuse treatment. We also conclude that the same legislature was persuaded that such an approach would on balance be more socially harmful than beneficial, because it would lead to more, rather than fewer, babies being born either without adequate prenatal care or damaged by prenatal drug abuse, or both.[25] We are also persuaded that the 1990 legislature, in adopting the approach taken by Substitute Senate Bill No. 197, considered that it would require a change in the law in order to give DCYS the power to seek termination of parental rights on the basis of a mother's prenatal illegal drug use.

These conclusions, while far from determinative of the issue, cast light on the legislative intent underlying § 45a-717. They disclose the difficult and delicate policy choices that are inherent in the provisions of House Bill No. 5205 that parallel the position of the petitioner in this case regarding the meaning of § 45a-717 (f) (2), policy choices that the legislature clearly rejected in 1990. These conclusions, therefore, counsel against reading § 45a-717 (f) (2) so as to reflect a resolution of

[25] We emphasize that we neither endorse nor reject these policy arguments. We conclude only that, in light of these arguments that the legislature accepted in 1990, it would be imprudent to interpret General Statutes § 45a-717 (f) (2) in such a way that would be inconsistent therewith, without clear legislative indication of an intent to do so.

those policy choices that would balance in favor of the petitioner's reading of that statute, at least without clear legislative indication of an intent to do so.

Furthermore, the legislature in enacting statutes is presumed to be aware of the existence of other legislation on the same or related issues; *Plourde* v. *Liburdi,* 207 Conn. 412, 417, 540 A.2d 1054 (1988); and "[s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." (Internal quotation marks omitted.) *Baybank Connecticut, N.A.* v. *Thumlert,* 222 Conn. 784, 790, 610 A.2d 658 (1992). The approach towards substance-abusing pregnant women that the legislature adopted by the enactment of Substitute Senate Bill No. 197, now General Statutes § 17a-644, coupled with the legislative rejection of the approach proposed by House Bill No. 5205, is inconsistent with the interpretation of § 45a-717 (f) (2) advanced by the petitioner. We therefore infer from this legislative activity in 1990 an intent that § 45a-717 (f) (2) does not contemplate a petition for termination of parental rights based upon the prenatal drug use by the mother. See *Weinberg* v. *ARA Vending Co.,* 223 Conn. 336, 612 A.2d 1203 (1992) (judicial consideration of subsequent enactments in order to illuminate legislative intent with respect to prior legislative action).

The petitioner argues, as did the trial court, that pursuant to § 45a-717 (f) (2) "[t]he fact [that] the mother's behavior occurred prior to Valerie's birth does not relieve the mother of responsibility for the injuries her child suffered at birth. Focusing on Valerie, it is difficult to discern any distinction between administering cocaine to Valerie nine hours before her birth or nine hours after her birth. The consequences to Valerie are the same. *The precise time of the injury should not be legally significant; the real issue is the injuries that*

*Valerie suffered. The statute requires the trial court to look back at the causes of the child's injury and, most importantly, to assess the risk of continued harm to the child."* (Emphasis added.) Although on the admittedly egregious facts of this case this argument has emotional appeal, we disagree with it as the appropriate reading of § 45a-717.

In this case, the respondent's prenatal conduct took place but several hours before the onset of labor. There is no principled way, however, to confine the language of § 45a-717 (f) (2) to prenatal maternal conduct that takes place only a short time before delivery of the baby, as opposed to maternal conduct that takes place early in the pregnancy. Indeed, the petitioner's argument recognizes this, and would have us read § 45a-717 (f) (2) so as to "look back" throughout the entire period of the pregnancy for the causes of the child's postnatal "injuries." Nor, for that matter, is there any principled way, under the petitioner's proposed reading of the statute, to confine its language to prenatal maternal conduct that is illegal, as opposed to conduct that is merely unwise or unhealthy. Thus, as the petitioner conceded in oral argument in this court, the same reading of § 45a-717 (f) (2) that the petitioner would have us adopt would permit the petitioner to seek termination of the parental rights of a mother who drank alcohol excessively during her pregnancy and delivered a baby suffering from fetal alcohol syndrome. We do not deny that a policy maker might want to grant the petitioner such a power. Nor do we deny that such prenatal conduct is harmful to the fetus in the womb and the child upon its birth. Our point is that, absent some fairly clear indication to the contrary, we do not believe that the legislature intended the statute as currently drafted to have such sweeping consequences.

We recognize, as the petitioner points out, that the intermediate appellate courts of some other jurisdictions have approved of custodial commitment petitions, and in at least one case a termination petition, based upon prenatal drug use by the mother. See, e.g., *In re Troy D.,* 215 Cal. App. 3d 889, 263 Cal. Rptr. 869 (1989) (commitment petition); *In re Solomon L.,* 190 Cal. App. 3d 1106, 236 Cal. Rptr. 2 (1987) (both commitment and termination petitions); *In re Nash,* 165 Mich. App. 450, 419 N.W.2d 1 (1987) (commitment petition); *In the Matter of Baby X,* 97 Mich. App. 111, 293 N.W.2d 736 (1980) (commitment petition); *Matter of Stefanel Tyesha C.,* 157 App. Div. 2d 322, 556 N.Y.S.2d 280 (1990) (commitment petition). We are unpersuaded by the reasoning of these decisions because they do not rely, as do we, on a close examination of the language, constitutional background and available legislative history of the statutory framework purporting to support a petition for termination of parental rights.

Nor are we persuaded, as the Appellate Court was and as the petitioner advances here, by the analogy to principles of tort law that have permitted a child subsequently born to maintain a cause of action for the injurious postnatal consequences of prenatal conduct of a third party. See *Ochs* v. *Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982); W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 55, p. 368. We agree with the respondent that the compensatory purposes of those tort principles are inapposite to the delicate and sensitive policy choices that inform our search for the legislative intent underlying § 45a-717 (f) (2).

## II

We turn next to the trial court's second ground for termination of the respondent's parental rights, namely, the absence of an ongoing parent-child relationship. The respondent claims that, under the facts

of this case, the judgment terminating her parental rights on that ground was unconstitutional under the due process and equal protection of the laws clauses of the federal and state constitutions, because the state was responsible for the absence of that relationship. We agree with the respondent that, under the facts and circumstances of this case, the state cannot prevail on that ground for termination of parental rights, but we rest this conclusion on established principles of statutory construction and, therefore, need not determine whether constitutional principles would also require the same conclusion.

We note first that the trial court found that there was no ongoing parent-child relationship between the respondent and the child *as of November 8, 1989*,[26] the adjudication date as determined by the date of the last amendment of the petition. See footnote 9, supra. Our consideration of the respondent's claim, therefore, must proceed on the premise that the petitioner established, under the facts of this case, a lack of an ongoing parent-child relationship between the respondent and her child at a point in time approximately three and one-half months after the birth of the child, where the petitioner had secured and maintained custody of the child for virtually all of that period of time.

The record discloses the following facts pertinent to this claim. The trial court found that while the respondent was in the hospital she "had much contact with

---

[26] At one point in its written articulation dated July 24, 1990, the trial court described the adjudication date of the termination petition to be "(as of 11/8/90)." It is clear, however, that this is simply a typographical error, and that the date the court intended to use was November 8, 1989. This is apparent from the date and entire context of the articulation, and from the facts that the court described the adjudication date of the coterminous neglect petition to be "(as of 11/8/89)," that November 8, 1989, was the date of the last amendment of the termination petition, and that the court specifically found that there was no parent-child "relationship between Valerie and her parents on November 8, 1989."

the [child]."[27] The respondent was discharged from the hospital on July 28, 1989, two days after the birth of the child. On August 3, 1989, the child was discharged from the hospital to the custody of the petitioner and placed in foster care in a home in Plantsville, a section of Southington approximately ten miles from where the respondent was living with her mother in Bristol.[28]

On August 24, 1989, the respondent telephoned the foster mother and arranged to visit the child on August 30, 1989. After the August 30 visit, she next visited the child on September 8 at Bristol Hospital, where the child had been admitted for treatment of pneumonia,[29] and visited her again in the hospital on September 12.[30] The child was discharged from the hospital on September 18, 1989. Because the respondent was a hepatitis carrier, however, upon the recommendation of the child's pediatrician DCYS requested the respondent not to visit the child until she produced a note from her physician that she was free of communicable diseases, including hepatitis. From approximately mid-September to October 4, when the respondent was able to produce the note, therefore, she was unable to visit the child. On October 10, the respondent telephoned the foster mother to inquire about the child, and visited the child at the foster home on October 19, October 23, October 25, October 30, and November 1, 1989.

[27] The respondent testified that she fed the child at each feeding, except the 1 a.m. feeding, and kept the child in the room at times and held her.

[28] According to the testimony of Kathy Dayner, the DCYS treatment social worker for the child, there was no bus or taxi transportation available between Bristol and Plantsville. The respondent was largely dependent on her mother for transportation to visit the child, although Dayner also testified that the respondent had never asked her to arrange transportation to visit the child.

[29] The child had also been in the hospital for treatment of pneumonia from September 3 through September 5, 1989.

[30] These visits were testified to by Karen Brinkman, an intake social worker with DCYS, to whom the hospital referred the matter of the child after her birth.

The trial court found that on October 9, 1989, the respondent entered an outpatient drug treatment program at Bristol Hospital, but remained in that program only until October 18, 1989. Despite a letter to her on October 31, 1989, from James Archambault, of the hospital counseling center, she did not return to the program.

On November 1 and 2, 1989, David M. Mantell, a licensed clinical psychologist, evaluated the respondent and the father, together with the child. The respondent admitted to Mantell that she was then incapable of caring for the child, and estimated that it would take at least one year before she would be sufficiently confident of recovering from her drug addiction to do so. In his report, dated November 5, 1989, he stated that there was no emotional connection between the respondent and the child.[31] Mantell also testified at the November 8, 1989 hearing that in his opinion there was no parent-child relationship between the respondent and the child.[32]

---

[31] In response to the question, "What is the nature of the relationship between the biological parents and the child?", Mantell stated in his report: "The biological parents visit the child in foster care, the mother more so than the father, the father with less interest than the mother. The pattern of interaction with the child reported by the foster mother also corresponds to the one observed in the office. There it is the mother who takes a stronger interest in the child, in holding the child and in interacting with the child, the father doing so at the request of the mother and only for short times. One does not observe a sense of emotional connection between the parents and this child. In a mechanical sense, the behavior exhibited toward the child by the mother is satisfactory."

[32] Mantell testified that "I don't think there is [such a relationship]—I don't know to whom the child might be attached, and my impression was that the child was not able to relate to either parent. The child showed no responses to me that indicated that the child recognized either parent, or was responding selectively to either parent. As far as the parents themselves are concerned, the father spoke to me about his interest in the child, and the fact that he sees the child as being a part of himself. But when I had an opportunity to see him with the child, I did not see him show that kind of interest in the child. The mother did not make a comparably strong

The trial court found that "Dr. Mantell's observations confirmed what a lay trier of fact could conclude about the nature of the relationship existing between Valerie and [the respondent] on November 8, 1989. He saw no sign of bonding on November 1 and 2, and indeed, the

statement to me about her sense of connection to the child, and I saw a greater interest on her part in holding the child, but I did not sense that she felt bonded with this child, as one would sense ordinarily when a parent or a mother is holding her own child. . . . [M]y sense of it is, I saw a mother holding a baby. I did not have the sense of, I am holding my baby."

Mantell defined "bonding" as a process that "generally . . . begins at the time that a pregnancy begins, and reflects an ongoing sense of interest on the part of . . . the mother . . . in that child and in that child's development . . . . It shows itself after the birth of the child by spending as much time as you can with the child, and holding and nurturing . . . and caring for the child. And it shows itself in the sense of intimacy that others can observe in the contacts that occur between the parent and the child." He testified that he did not observe that kind of intimacy between the respondent and the child.

In contrast, Patricia Ann Pastor, the foster mother, described the respondent's interaction with the child as "[g]reat." She expanded on this as follows: "she does well with her. I usually try to time [the respondent's visit] so it's feeding time for the baby, and she does very well with her. She's not afraid of her. She gets a little nervous once in a while, because the child is sick a lot . . . [S]he doesn't get all upset if . . . the least little thing happens. It's . . . like any normal mother and newborn, is the best that I know how to put it." Pastor also testified that, on her visits to the child, the respondent "mostly interacts with the baby, or . . . she only asks questions about the baby." She testified further that the respondent brought presents for the child—on October 19, a stuffed teddy bear, a rattle and "little play keys that . . . used to be her sister's"; on December 8, a pair of dress shoes; and at Christmas, a stuffed musical lamb. Pastor also catalogued the respondent's visits to the child and telephone calls about her, after the adjudication date of November 8, 1989, as follows: telephone calls on November 28 and November 29, a visit on December 8, telephone calls on December 30 and 31, 1989, January 11, 1990, and a visit on January 13, 1990. Pastor also explained that no visits or calls were possible between December 21 and 27, 1989, when she and her family were on vacation.

It is clear, however, that the trial court accepted Mantell's opinion regarding the relationship between the respondent and the child, and did not credit Pastor's testimony. We proceed, therefore, upon the assumption that the trial court's finding regarding a lack of an ongoing parent-child relationship between the respondent and the child is adequately supported by the record.

[mother] of a newborn who had only seen the child a handful of times in the first three months of life could not have developed the kind of relationship that results from '. . . a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child,' as described in [General Statutes § 45a-717 (f) (3)]." This finding, which was stated in the court's July 24, 1990 written articulation, was consistent with its earlier oral finding on March 28, 1990, that the court was "not holding the parents responsible for the fact that bonding was impossible. I think that both [counsel for the parents] stressed in [their] briefs that you can't develop a bond when you have to hitch a ride with your mother-in-law . . . and at most can visit a child infrequently . . . . [Y]ou can't bond with any child I think in foster care unless there is almost daily interaction for four to six hours a day . . . ." It is clear from this record, therefore, that the lack of an ongoing parent-child relationship between the respondent and the child was the direct result of the fact that the child was in foster care apart from the respondent for almost the entire period of time between the birth and the adjudication date.

Section 45a-717 (f) (3) defines an "ongoing parent child relationship" as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child." We have recognized that the statutory definition "is inherently ambiguous when applied to noncustodial parents who must maintain their relationships with their children through visitation." *In re Jessica M.*, supra, 467–68. In such a case, we held that "the ultimate question is whether *the child* has no present memories or feelings for the natural parent." (Emphasis added; internal quotation marks omitted.) Id.[33]

---

[33] We also followed the lead of the Appellate Court; *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 709, 483 A.2d 1101 (1984), cert. denied, 195 Conn.

Until now, however, we have not been required to apply this definition to a case, like this, where the child involved is virtually a newborn infant whose present feelings can hardly be discerned with any reasonable degree of confidence. We agree with the implicit conclusion of the trial court in this case that, in such a case, the inquiry must focus, not on the feelings of the infant, but on the positive feelings of the natural parent.[34] Furthermore, until now we have not been required to consider a case in which coterminous petitions for custody and termination of parental rights have been filed virtually upon the birth of the child, and where, by virtue of the custody petition, the newborn child has been in foster care from the date of discharge from the hospital to the date of the adjudication of a lack of an ongoing parent-child relationship.

Against this background, therefore, we consider the question of whether our statutory framework regarding commitment and termination, reasonably construed, permits termination of parental rights upon the basis of the lack of an ongoing parent-child relationship in the circumstances of this case.[35] We conclude that it does not.

801, 487 A.2d 564 (1985); in further refining this definition to require that the child's memories or feelings be positive in nature. See *In re Jessica M.*, 217 Conn. 459, 469, 586 A.2d 597 (1991).

[34] It is not necessary in this case to define further the nature of the feelings on the part of the noncustodial parent of a newborn infant that make up a "parent child relationship" within the meaning of General Statutes § 45a-717 (f) (3). We assume without deciding that Mantell's testimony, adopted in effect by the trial court, was sufficient to establish the lack of such a relationship. See footnote 32, supra.

[35] In *In re Juvenile Appeal (84-BC)*, 194 Conn. 252, 256 n.6, 479 A.2d 1204 (1984), we "reserve[d] . . . for another day" the question of "whether it is constitutionally permissible to terminate an individual's parental rights when the state is largely or solely responsible for the existence of the grounds upon which the termination is based." Our conclusion that, as a matter of statutory construction, the state may not, under the circumstances of this case, obtain and maintain custody of the child so as to create a lack of an ongoing parent-child relationship, renders it unnecessary to reach this constitutional question.

This consideration involves the intersection of two separate but closely related statutes: § 46b-129, which permits the petitioner, pursuant to court order, to obtain custody of a child under specified circumstances; and § 45a-717 (f) (3), which permits the court to terminate parental rights where the petitioner establishes the lack of an ongoing parent-child relationship. We do not read those two statutes to enable the petitioner to gain and maintain custody of a newborn infant pursuant to § 46b-129 under circumstances, as in this case, that will lead almost inevitably to the ground for termination under § 45a-717 (f) (3). A contrary conclusion would violate well established principles of statutory construction.

Statutes are to be construed consistently with other relevant statutes, because we presume that the legislature intended to create a coherent body of law. *Baybank Connecticut, N.A.* v. *Thumlert,* supra. We therefore read § 46b-129 so as to be consistent with § 45a-717 (f) (3). Under § 46b-129 (b), the respondent may establish the grounds for temporary custody of the child by a "reasonable cause" standard of proof, and under § 46b-129 (d) may establish the grounds for commitment for eighteen months by a preponderance of the evidence. By contrast, under § 45a-717 (f) (3), the petitioner must establish the ground for termination by clear and convincing evidence. As the facts of this case demonstrate, however, once the child had been placed in foster care pursuant to the determinations made under § 46b-129, a finding of a lack of an ongoing parent-child relationship three and one-half months later was inevitable under § 45a-717 (f) (3), because absent extraordinary and heroic efforts by the respondent, the petitioner was destined to have established the absence of such a relationship. Thus, a factual predicate for custody, established by the lesser standard of a preponderance of the evidence, led inexorably, for

all practical purposes, to the factual predicate for termination required to be established by the higher standard of clear and convincing evidence. We do not believe it would be consistent to read the two statutes together so as to contemplate such a scenario.

Furthermore, statutes are to be read so as to avoid bizarre results. *State* v. *Uretek, Inc.,* 207 Conn. 706, 719, 543 A.2d 709 (1988). A parent, faced with a petition for custody under § 46b-129, may feel that she is unable to care properly for her newborn infant and, therefore, may acquiesce in that petition, as occurred in this case. That acquiescence, moreover, was in the child's best interests. To permit that acquiescence to ripen into a ground for termination of parental rights, however, simply by virtue of the practical impossibility of maintaining the kind of contact with the child required to establish an ongoing parent-child relationship, would turn the statutory promise of appropriate care for the child into a cruel statutory hoax of termination of parental rights. We do not believe that the two statutes contemplate such a result.

Finally, statutes are to be read so as to avoid, rather than to create, constitutional questions. *French* v. *Amalgamated Local Union 376,* 203 Conn. 624, 636-37, 526 A.2d 861 (1987). In *Logan* v. *Zimmerman Brush Co.,* 455 U.S. 422, 424, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982), the United States Supreme Court held that a state may not "terminate a complainant's cause of action because a state official, for reasons beyond the complainant's control, failed to comply with a statutorily mandated procedure." Although the bases of the decision varied among the various members of the court, the case is susceptible of the broad reading, advanced by the respondent in this case, that a state may not, consistent with due process of law, create the conditions that will strip an individual of an interest protected under the due process clause. Under the cir-

cumstances of this case, the petitioner's assertion and maintenance of custody of the child led directly to the conditions supporting the termination of parental rights. If we were to read § 46b-129 so as to create the conditions for termination under § 45a-717 (f) (3), the constitutionality of the statutory scheme, as applied to the facts of this case, would be in serious jeopardy under *Logan* v. *Zimmerman Brush Co.*, supra. We therefore read the statutes so as to avoid such a question.

We conclude, therefore, that §§ 46b-129 and 45a-717 (f) (3) cannot be read together so as to permit the custody determinations made under the first statute to lead directly to the termination determination made under the second statute. Under the facts of this case, this conclusion fatally undermines the finding of a lack of an ongoing parent-child relationship under § 45a-717 (f) (3).

The judgment of the Appellate Court is reversed, and the case is remanded to that court with direction to remand the case to the trial court with direction to render judgment for the respondent.

In this opinion the other justices concurred.