[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On October 11, 1999, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of the respondents to their son, Gilbert. The petition alleges that the respondent parents have failed to be rehabilitated since the time Gilbert was found by this court to be neglected. The petition also alleges that there is no parent-child relationship between father and son. A trial was held before the Child Protection Session of the Superior Court on October 19, 2000. Both parents attended and were represented by counsel.
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. CT Page 12 If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child . . . In re John G., 56 Conn. App. 12, 17,740 A.2d 496 (1999). "In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Kasheema L., 56 Conn. App. 484,487, 744 A.2d 441, cert. denied, 252 Conn. 945, ___ A.2d ___ (2000);id., 490; see Practice Book § 33-3(a). With this principle in mind, the court finds the following facts with respect the mother.
 I A.
Gilbert is the younger of two children born to Jodie. An older half-sibling was seventeen years old at the time of trial and is not involved in these proceedings. Jodie was born on September 17, 1962 and was thirty eight years old at the time of trial. She is a high school graduate. At age 16 she was hospitalized for chronic depression. She has worked as a waitress in various restaurants, as a cook, a receptionist and a domestic. At the time of trial, she was employed as a waitress.
Jodie's relationship with Gilbert's father has been marked by illicit drug use, especially cocaine, and domestic violence, of which she has been both a victim and perpetrator.
On May 1996, Gilbert was born to the respondents. At the time of his birth, both he and his mother tested positive for cocaine. Shortly after the birth, Jodie told DCF social worker Anna Wilkins that she had ingested a "line" of cocaine just before the baby's birth but that she did not have an on-going drug abuse problem.
During 1996, Jodie took reasonably good care of Gilbert. The baby appeared to be healthy and well fed, was gaining weight, and was clean and dressed appropriately. There was an adequate amount of baby food and other food in the house. The child's physician had no concerns. Jodie indicated a willingness to cooperate with DCF.
Both respondents, however, denied that they had a drug problem and continued to use drugs. Shortly after Gilbert's birth, in 1996, Wilkins referred Jodie to Advanced Behavioral Health for drug screening and treatment. Wilkins also arranged for a parent aide and a visiting nurse to come to the home. Both respondents tested positive for cocaine, and they dismissed the parent aide. CT Page 13
Wilkins arranged for Jodie to receive outpatient treatment for her drug abuse at the Wheeler Clinic, Life Line Program, in New Britain, Ct. Jodie failed to keep her appointment. She subsequently told Wilkins that she did not like the Lifeline Program. Jodie also volunteered that she was taking Percoset and Vicodin, prescription medicines she obtained "on the street" or from friends. One week into the Lifeline program, Jodie had a random drug screen that tested positive.
Wilkins subsequently referred Jodie to the New Britain General Hospital outpatient drug treatment. Jodie failed to attend.
In the summer of 1997, Maria Kornafel became the DCF social worker responsible for Gilbert's case. She referred Jodie to Catholic Family Services for drug evaluation. Jodie tested positive for cocaine.
On August 6, 1997, Gilbert was adjudicated a neglected child and an order of protective supervision was granted.
On October 2, 1997, Jodie was admitted to the Wheeler Clinic for treatment of her drug addiction. She continued to use narcotics during the course of her treatment and, according to the discharge summary, continued to be involved with the respondent father "who was very physically abusive." Wheeler Clinic referred Jodie to the Prudence Crandall Shelter, a battered women's shelter.
In December, 1997, DCF referred both respondents to Klingberg Family Centers in New Britain. The reason for the referral, according to the Klingberg summary, was that "both parents are using drugs, and have a long history of multi-substance abuse. Also, both parents have mental health issues. DCF states that the children are at risk of removal from the home." Jodie admitted using cocaine for four years. The father stated that he used Xanax which he purchased illegally. He stated further that he used cocaine and marijuana when he could not buy Xanax. He worried that one day he would be shot. The father flatly stated that he was not willing to go into treatment. Jodie also did not feel that she had a drug addiction but agreed "to call" treatment providers if DCF would not remove her child. The Klingberg summary further discloses:
 During several of these sessions, [the father] became very agitated and angry, verbally threatening those who required him to get treatment.
In the process of working with Jodie to get into treatment, Jodie disclosed incidents of Domestic Violence. Jodie stated that at present and in the past [the father] has been physically, emotionally, and CT Page 14 sexually abusive. At this point, the therapist became concerned for Jodie and the children's safety. I also became afraid of my own safety in this home due to [father's] angry and threatening behavior.
 Jodie eventually returned to the Lifeline program at Wheeler Clinic. Jodie was under a strict contract that required sobriety, attending NA meetings outside of the program, and expulsion from the program if the contract was violated. One week into the program, Jodie tested positive on a random drug screening. . . . Also on this day, Jodie came to the program with a bruise on her face and a chipped tooth. At this point [January, 19981, Jodie was suicidal and hospitalized at New Britain General Hospital.
Jodie did well in treatment at the hospital and agreed to enter a domestic violence shelter. With Jodie's permission, Kornafel and the Klingberg therapist assisted her in admission to the Prudence Crandall Shelter and in receiving domestic violence services. During her first week at the shelter, Jodie discussed leaving the father, who had physically and emotionally harmed her, and who, she claimed, was her "connection" to cocaine. The following week, however, she was discharged from the shelter because she had contact with the father. The date of her discharge was February 20, 1998. The discharge summary states: "At this point, [the father] had been threatening the [Prudence Crandall] shelter workers, and myself. Jodie did not understand the seriousness of her situation. Jodie put herself, this therapist, and the women of the shelter at risk. This therapist terminated services due to the safety issues of Jodie living at home with [the father]." Klingberg recommended that Jodie receive support and education to understand the seriousness of her domestic violence situation as well as long-term drug treatment. Klingberg also recommended that the father receive inpatient drug and psychiatric treatment to address his addiction and anxiety.
On February 19, 1998, DCF took Gilbert into emergency custody pursuant to General Statutes § 17a-101g(c). That same day, a judge of this court granted DCF's application for an order of temporary custody of Gilbert, pursuant to General Statutes § 46b-129, due to the respondents' existing historical domestic violence and substance abuse.
Between February, 1998 and June, 1998, Jodie told her social worker that she intended to seek treatment at the Dual Diagnosis Center, for her substance abuse and depression. She never did so.
On April 23, 1998, Jodie re-entered the Lifeline outpatient program. CT Page 15 Despite her denial that she had been using narcotics, her first urine test was positive for cocaine. Lifeline reported:
 During her two (2) week outpatient substance abuse treatment . . . at Lifeline [Jodie's] behavior was disruptive. For example, when [she] was told her son . . . could not be present at a barbecue at Lifeline, [she] became belligerent; yelling and talking out of turn, turning away from staff and clients when being addressed. Her behavior has become self-destructive; getting into someone's car intoxicated when the driver herself was intoxicated; hitch-hiking to work and getting into a physical altercation with another female who according to [Jodie] was drunk.
Jodie was discharged from the program. Lifeline recommended that she receive residential substance abuse treatment.
On July 27, 1998, the order of protective supervision was modified to a commitment of Gilbert to the custody of DCF. At that time, the court issued the following expectations to Jodie: Keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney; visit the child as often as DCF permits; participate in parenting counseling; participate in individual, family and drug/alcohol counseling at an in-patient substance abuse program such as "Crossroads," which counseling will include domestic abuse counseling submit to random urine screens and hair test; secure and maintain adequate housing and income; do not engage in substance abuse; and have no involvement with the criminal justice system. The document listing these expectations notified Jodie that "[f]ailure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights so that your child may be placed in adoption."
In July, 1998, the utilities in Jodie's apartment were shutoff and she was admitted to the Morris Shelter, a therapeutic shelter. Kornafel took Jodie to three intake appointments, including the Carnes Weeks Center. Jodie was placed on the waiting list for Crossroads but only wanted a program that allowed her to be with Gilbert.
The Morris Shelter referred Jodie to the Carnes Weeks Center to address her alcohol and cocaine dependency. She was told not to leave the facility for thirty days. She attended 28 days of an intensive, inpatient substance abuse program. While she read the materials given her, she minimized her drug use and blamed others for her problems. She made no progress in staying out of "unhealthy relationships." On August 21, 1998, she left the program and never returned. Carnes' discharge summary CT Page 16 states: "It would be at [sic] the client's best interest if she pursued long-term treatment. Her dependency on men, and her lack of maturity will continue to be barriers in her recovery. It's questionable if she'll remain abstinent." Because Jodie had left the program against staff advice, Carnes did not refer her to another program.
On February 3, 1999, Jodie went into the Dual Diagnosis Program. However, she was discharged from the program on February 19, 1999 for using cocaine, being disruptive and falling asleep during group sessions. This was the last time she was in treatment before the filing of the termination petition. She failed to appear for hair test appointments in August, 1999.
Throughout 1998 and 1999, Jodie was afforded visitation with Gilbert which she fairly consistently exercised.
 B.
At the time this petition was filed, General Statutes § 17a-112(c) provided that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence (1) that the Department of Children and Families has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 or section 17a-111b that such efforts are not appropriate, (2) that termination is in the best interest of the child, and (3) that . . . the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."
"The statute does not define the degree of personal rehabilitation required or the meaning of a "responsible position in the life of the child." "A responsible position" is not necessarily the same thing as a full time caretaker.'" In re Migdalia M., 6 Conn. App. 194, 206,504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986). "Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.' . . . `Rehabilitate' means CT Page 17 `to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' [Webster's] Third New International Dictionary. The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." In re Eden F., 250 Conn. 674,706, 741 A.2d 873, rearg. den., 251 Conn. 924, 742 A.2d 364
(1999).
The issue of whether Jodie was ever rehabilitated is not a close call. Jodie knew that she had to overcome her substance abuse and address other aspects of her behavior in order to reunite with her child. Despite reasonable and repeated efforts by DCF to reunify mother and child, Jodie was no closer to rehabilitation from her drug and other destructive behavioral problems when the petition was filed than she was when Gilbert was born.
On February 10, 2000, Dr. Kelly Rogers, Ph.D. evaluated Jodie.[1]
Jodie points to a statement in Dr. Rogers' report that "a delusional disorder should be ruled out." In a feat of logical gymnastics, Jodie argues that a delusional disorder must have existed if it was "ruled out." If it existed, she contends, then DCF failed to use reasonable efforts address it and hence failed to use reasonable efforts to reunify her and Gilbert.[2]
"It is axiomatic under Connecticut law that, while a [trier of fact] may reject . . . testimony, a [trier of fact] in rejecting such testimony cannot conclude that the opposite is true. State v. Alfonso, 195 Conn. 624,634, 490 A.2d 75 (1985), quoting Novak v. Anderson, 178 Conn. 506, 508,423 A.2d 147 (1979); see also State v. Carter, 196 Conn. 36, 50,490 A.2d 1000 (1985) (Shea, J., dissenting) (trier cannot make affirmative factual finding from disbelief of testimony); State v.Mayell, 163 Conn. 419, 426-27, 311 A.2d 60 (1972) (jury cannot make affirmative finding from disbelief of obviously concocted alibi testimony of defendant)." State v. Gainer, 51 Conn. App. 563, 574-75, 724 A.2d 521
(1999). "A [trier] cannot, from a disbelief of . . . testimony, infer that a plaintiff's allegation is correct. Ferri v. Smith, 151 Conn. 481,483, 199 A.2d 331 [1964]; Snyder v. Pantaleo, 143 Conn. 290, 294,122 A.2d 21 [1956] Frisbie v. Schinto, 120 Conn. 412, 181 A. 535 [1935];Ziman v. Whitley, 110 Conn. 108, 147 A. 370 [1930]" Novak v. Anderson, supra. CT Page 18
To "rule out" means "exclude, eliminate." Merriam Webster's Collegiate Dictionary (1996). Since the only evidence is that Dr. Rogers "ruled out" a delusional disorder, there is no evidence that such a disorder ever existed.
By clear and convincing evidence, the court finds that as of the filing of this petition Jodie had "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [she] could assume a responsible position in the life of [her] child. . . ." General Statutes § 17a-112(c); see In re Kasheema L., supra, 56 Conn. App. 489-90; Inre Michael L., 56 Conn. App. 688, 694, 745 A.2d 847 (2000); In re CarissaK., 55 Conn. App. 768, 779-781, 740 A.2d 896 (1999); In re Tricia A., supra, 55 Conn. App. 116; In re Roshawn R., 51 Conn. App. 44, 720 A.2d 1112
(1998); In re Kristina D., 51 Conn. App. 446, 451, 721 A.2d 1256 (1999)
 C.
"If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether the termination of parental rights is in the best interests of the child . . . The dispositional phase, like its adjudicatory cousin, also must be supported on the basis of clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) In re Alissa N., 56 Conn. App. 203, 207, 742 A.2d 415
(1999).
Dr. Rogers evaluated Jodie, although she failed to appear for her first appointment with him. He testified at trial that Jodie has low average intelligence but probably functions in the average range. Her limited intellectual abilities, however, do not affect her ability to raise a child. He further opined that Jodie was emotionally labile and mercurial. Her actions in raising a child would be erratic. Children require predictability and stability. She has a personality disorder, is dependent on men and is antisocial, possessing multiple self defeating traits. In her interaction with Gilbert, she was very appropriate with him. However, he displayed a lack of enthusiasm toward her, and did not seek out her touch nor return her affection. In sum, there was no evidence that the child was emotionally attached to her. Because of her continued drug use and erratic life style, she is unable to responsibly and safely care for the child in the foreseeable future.
"The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Citations omitted; internal quotation marks CT Page 19 omitted.) In re Shyina B., 58 Conn. App. 159, 167, ___ A.2d ___ (2000), quoting Schult v. Schult, 241 Conn. 767, 777, 699 A.2d 134 (1997). All of these factors militate strongly in favor of terminating Jodie's parental rights.
Jodie continues to use drugs, though she also continues to waitress. She shifts responsibility for her failure to succeed in the several rehabilitation programs to which she was referred from herself to other people and circumstances. Her testimony was often untruthful. For example, she denied using cocaine and a moment later admitted using. However, she admitted that she was unable to care for her child; see Inre Tricia A., 55 Conn. App. 111, 116, 737 A.2d 974 (1999); and it was clear that she would be unable to do so in the foreseeable future.
Gilbert is now 4 1/2 years of age. For 2 1/2 years he has been in the care of the respondent father's sister and her husband. Gilbert refers to them as "mommy Nancy" and "daddy Larry." In their care, he has progressed and developed very well. Although Larry did not testify, Nancy did. It is clear that she loves Gilbert very much, and he is very much a part of her family. Importantly, she testified that if the respondents' parental rights were terminated, she and her husband would "definitely" adopt Gilbert. Jodie conceded that Gilbert had a good home with Nancy and Larry. For a life that began so inauspiciously, Gilbert is uniquely fortunate to have come into the loving and nurturing care of this family. Our cases recognize that "long-term stability is critical to a child's future health and development. . . ." In re Eden F., supra,250 Conn. 709. The court finds by clear and convincing evidence that it is in Gilbert's best interests that the respondent mother's parental rights be terminated.
 D. Mandatory Findings
General Statutes § 17a-112(d) requires the court to make certain findings in determining whether to grant a petition to terminate parental rights.[3]
 1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.
From Gilbert's birth in 1996 through February, 1999, DCF timely and persistently offered services to Jodie. Shortly after Gilbert's birth, in 1996, DCF referred Jodie to Advanced Behavioral Health for drug screening CT Page 20 and treatment. DCF also arranged for a parent aide and a visiting nurse to come to the home. DCF arranged for Jodie to receive outpatient treatment for her drug abuse at The Wheeler Clinic, Life Line Program, in New Britain, Ct.
DCF referred Jodie to Catholic Family Services for drug evaluation. Jodie tested positive for cocaine. DCF referred Jodie to the Wheeler Clinic for treatment of her drug addiction. Wheeler Clinic referred Jodie to the Prudence Crandall Shelter, a battered women's shelter. In December, 1997, DCF referred the respondents to Klingberg Family Centers in New Britain. From there she returned to the Lifeline Program on April 23, 1998, and was subsequently hospitalized at New Britain General Hospital. When the father had the utilities to her apartment shut off, Jodie was admitted to the Morris Shelter. DCF facilitated Jodie's referral to the Carnes Weeks Center and her being placed on the waiting list for Crossroads. On February 3, 1999, Jodie went into the Dual Diagnosis Program.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
As evidenced by the services repeatedly offered to Jodie and the visitation consistently afforded her, DCF made reasonable efforts to reunite mother and child.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
On July 27, 1998, the court issued the following expectations to Jodie: Keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney; visit the child as often as DCF permits; participate in parenting counseling; participate in individual, family and drug/alcohol counseling at an in-patient substance abuse program such as "Crossroads," which counseling will include domestic abuse counseling submit to random urine screens and hair test; secure and maintain adequate housing and income; do not engage in substance abuse; and have no involvement with the criminal justice system. The document listing these expectations notified Jodie that "[f]ailure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights so that your child may placed in adoption."
DCF afforded the respondent regular visitation with her child which she exercised. The respondent failed to cooperate with the various counseling CT Page 21 programs to which DCF referred her. Jodie was inconsistent in maintaining adequate housing. There is insufficient evidence to find that she did not secure and maintain an adequate income. She submitted to some urine and hair tests which were positive for cocaine. She continued to use cocaine from Gilbert's birth in 1996 up to the time of trial.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Based on Dr. Roger's testimony, the court finds that any emotional attachment Gilbert has to Jodie is not substantial. He does refer to her as "mommy Jodie" but certainly does not view her as a psychological parent, if indeed he views her as a parent figure at all. His psychological parents are his foster parents into whose family he has been thoroughly integrated over the past 2 1/2 years.
5. Finding regarding the age of the child.
The child is now 4 1/2 years of age, having been born on May 1996.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of the child.
Jodie has maintained regular contact with the child through weekly visitation; she has not been afforded communication with the foster parents. Because of her repeated failures in numerous programs and her continued long-term cocaine use she has not made significant efforts to adjust her circumstances or conduct to make it in the best interest of Gilbert to return to her home in the foreseeable future.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent. CT Page 22
The term "meaningful relationship" is not defined in the statutes, nor, in the context of General Statutes § 17a-112, in the case law. "Accordingly, we must focus upon its common understanding as expressed in the law and upon its dictionary meaning. . . . In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . General Statutes § 1-1(a)." (Citation omitted; internal quotation marks omitted.) State v. Guckian,226 Conn. 191, 202, 627 A.2d 407 (1993); Builders Service Corporation,Inc. v. Planning Zoning Commission, 208 Conn. 267, 276, 545 A.2d 530
(1988); Baerst v. State Board of Education, 34 Conn. App. 567, 576,642 A.2d 761, cert. denied, 230 Conn. 915, 645 A.2d 1018 (1994). The word "meaningful" has been defined as "[h]aving a meaning or purpose . . . full of meaning." Webster's Ninth New Collegiate Dictionary (1991). "Relationship" has been defined as . . . the state of being related or interrelated . . . the relation connecting or binding participants in a relationship as . . . kinship . . . a specific instance or type of kinship. . . ." Id.; see State v. Guckian, supra, 226 Conn. 202.
Thus, the term "meaningful relationship" in General Statutes §17a-112(d) calls for a connection between the parent and child. Cf. Statev. Guckian, supra, 226 Conn. 202. In addition, "under the maxim of `noscitur a sociis,' the meaning of a particular word or phrase in a statute is ascertained by reference to those words or phrases with which it is associated." Staples v. Palten, 214 Conn. 195, 199, 571 A.2d 97
(1990). In determining the meaning of the phrase "meaningful relationship" the court must not ignore the reality that it is a termination of parental rights statute that we are interpreting. "It is a basic tenet of statutory construction that the intent of the legislature is to be found not in an isolated phrase or sentence but, rather, from the statutory scheme as a whole . . . Therefore, [a] statute should be read as a whole and interpreted so as to give effect to all of its provisions." Figueroa v. C and S Ball Bearing, 237 Conn. 1, 6, 675 A.2d 845
(1996), and cases cited therein. Applying these principles, the court holds that the term "meaningful relationship" must be understood in the context of a parent-child relation. This interpretation, moreover, is consistent with the mandate of General Statutes (Rev. 1999) §17a-112(i) that "[t]he provisions of this section shall be construed in the best interests of any child for whom a petition under this section has been filed."
Jodie has not been prevented from maintaining a meaningful relationship with Gilbert by the unreasonable act or conduct of any other person or by economic circumstances. "While the mother's means are clearly very limited, the record does not support the conclusion that her limited means — as opposed to her other problems — have interfered with her relationship with her child." In re Kevin M., Superior Court, CT Page 23 Judicial District of Hartford-New Britain at Hartford (Nov. 14, 1994).
 II A.
The court turns to the issues pertaining to the termination of the respondent father's parental rights. The following additional facts are necessary for resolution of those issues.
The respondent father was born in New Britain, Connecticut on October 10, 1966. He has never been married. Since the age of twelve, he has used marijuana. He stated to Kornafel that marijuana was in his bones and that he needed it to function. He did not plan to give up its use. As the father grew older, he began using cocaine and eventually became addicted to it.
During the 1990's the father self-medicated himself with Xanax (for which he previously had a prescription), clonidine, "headache pills" and other prescription medications that he purchased "on the street."
In 1996, soon after DCF became involved with Gilbert, the father told the DCF social worker that if anyone took his child, he would shoot that person. By this time, the father had a criminal record consisting of possession of narcotics and reckless endangerment.
In 1996 or 1997, the father saw a physician in Bristol who recommended that he undergo a drug evaluation and drug treatment. The father did not follow this recommendation. In the summer of 1997, DCF referred the father to the Dual Diagnosis Program at New Britain General Hospital, for drug and other mental health treatment. The father refused to go. He told Kornafel that he used Xanax and was not going to stop using it because he needed it. By the end of 1997, Kornafel wanted to terminate the father for noncompliance, hostility and volatility.
On August 6, 1997, Gilbert was adjudicated a neglected child. The court ordered protective supervision. In December, 1997, DCF referred both respondents to Klingberg Family Centers. Klingberg terminated its assistance to the respondents after two months because of the father's threats to its social worker and others. Klingberg recommended that the father receive in-patient drug and psychiatric treatment. The father became very agitated, angry, and verbally threatening and announced that he was not willing to go into treatment.
On February 17, 1998, the father was arrested at the Prudence Crandall Shelter where Jodie and Gilbert were residing. He was charged with CT Page 24 threatening, violation of a restraining order, and possession of narcotics, in violation of General Statutes § 21a-279, a felony. At the time he was arrested, the father was in possession of eleven packets of cocaine containing five to six grams each. It was at this time that DCF obtained an order of temporary custody of Gilbert.
The father was incarcerated after this incident and did not request to see Gilbert. After his arrest, DCF did not offer the father services, until after the filing of this petition, nor did it offer him visitation. The last time the father saw Gilbert was February 19, 1997. During 1997 and 1998, the father had counsel who appeared for him in court. He did not move for visitation. On May 15, 1998, the father received a suspended sentence of four years imprisonment with four years probation and was released. The terms of his probation included no contact with Jodie unless permitted by the court or by DCF, counseling, including anger management and parenting classes, urinalysis, drug treatment, no associating with drug dealers or users, no use of narcotics.
On June 24, 1998, the father contacted DCF and requested to see his son. No visits were scheduled by DCF.[4]
On July 27, 1998, the court issued the following "expectations" to the father: Keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney; visit the child as often as DCF permits; participate in parenting counseling; participate in individual counseling, including anger management, and address mental health issues; participate in drug/alcohol counseling, including urine screens and hair test; cooperate with the terms of [his] probation; secure and maintain adequate housing and income; do not engage in substance abuse; have no involvement with the criminal justice system; ensure that all contact with Gilbert is supervised by DCF. The document listing these expectations notified the father that "[f]ailure to achieve these goals will increase the chance that a petition may be filed to terminate your parental rights so that your child may be placed in adoption."
On July 6, 1998, two weeks after requesting visitation with Gilbert, the father attended an Administrative Case Review at DCF. The social study reflects, and the father, who testified, did not controvert, that "he was hostile and verbally aggressive toward [Jodie]. The facilitator had to separate them. At that time [the father] stated that he did not follow any DCF recommendations which included drug treatment because he had no time and had a broken leg. He also said that he doesn't want for his son to be in [the] care of . . . [Jodie] who is a substance abuser, pathological liar and has a violent boyfriend. He also accused [Jodie] of working as a stripper." CT Page 25
The DCF social worker discussed with the father his going in-patient at a facility called "Blue Hills." Although there is a question as to whether the father had health insurance at all relevant times, he refused to go in-patient.[5]
The social study submitted for this petition states, and the father did not controvert, that
 On July 8, 1999, [father] said that he is not interested in following any DCF expectations. In his opinion he is unable to take care of his son, Gilbert. . . . [The father] stated that he is willing to voluntarily terminate his parental rights only if his son were adopted by his sister . . . who is the relative foster parent of Gilbert. . . .
 On September 17, 1999, [the father] was called by [DCF] social worker, Maria Kornafel. He said that he doesn't have time to talk because he is waiting for an important phone call from his girlfriend. However, he is still not working, didn't attend any substance abuse treatment, is not attending parenting classes. He said he hasn't seen his son for the last 20 months.
Subsequent to the filing of this petition, Dr. Rogers interviewed and evaluated the father. In the interview, the father admitted to the long-term use of powder cocaine, and admitted that it ruined his life. He also claimed to have last used the drug in October, 1999. He claimed to have abandoned marijuana a year ago. The father also admitted that he had a gambling problem, that he purchased about $1000 in lottery tickets a week, and sold drugs to finance his gambling habit.[6] In the interview, the father also expressed a desire to see his son.
In his report, Dr. Rogers observed that the father "suffers from a clinically significant dysphoria which may represent a superimposed Dysthymia. In either event, he feels almost constantly overwhelmed by his life and, particularly, his emotional pain. He is strongly driven by feelings, and this makes it difficult for him to introduce the moderating effects of reason. He is likely known for his impulsive outbursts and unbridled emotionality. Sensing this at some level, he tends to isolate [sic] to avoid almost inevitable confrontations. He has very little tolerance for even the stresses of everyday life and frequent impulsive action, accompanied by notably poor judgment, is likely. He shows limited insight regarding his, or anyone else's motivations and workings, and he probably misinterprets much of what he witnesses. Acting accordingly, he CT Page 26 further distances himself from potential supports. Predictably, his experiences have led him to think little of his worth and abilities, and to anticipate that most of his relations will ultimately end badly. He views the world as a threatening and unsure place."
Dr. Rogers further stated that the father has an IQ in the borderline range and had no cognitive impairment. Dr. Rogers further opined: "Personality testing uniformly confirmed the anxiety disorder diagnosis evident in available history. He appears to suffer substantial and generalized apprehension accompanied by the physiological symptoms of anxiety. A creature of unbridled emotion and impulse, he feels cheated in life, and responds with appreciable anger; sometimes aggression. . . . [I]t seems likely that he suffers from Dysthymia. A diagnosis of Generalized Anxiety Disorder also seems appropriate. There was no compelling indication of Obsessive/Compulsive Disorder. His maladaptive Personality Disorder, Not Otherwise Specified, with Antisocial, Self-Defeating and Passive-Aggressive Traits. History suggests a diagnosis of Polysubstance Dependence in Early Partial Remission."
 B. 1.
Next, the court addresses the issue of whether DCF was required to use reasonable efforts to reunite the parents with the child and whether it did use such efforts.
"Before a termination of parental rights can be granted, the trial court must be convinced that the department has made reasonable efforts to reunite the [child with the] family. . . . Turning to the statutory scheme encompassing the termination of the parental rights of a child committed to the department, the statute imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . ." (Internal quotation marks omitted.) In reAntonio M., 56 Conn. App. 534, 546, 744 A.2d 915 (2000).
The court need not make a finding of reasonable efforts, however, if it has determined at a hearing pursuant to General Statutes §§ 17a-110(b) or 17a-111b that such efforts are not appropriate. Here, the court's file, of which the court takes judicial notice, reflects that on July CT Page 27 21, 1999, at a hearing on a motion to extend Gilbert's commitment, the court (Shapiro, J.) determined that reasonable efforts at reunification no longer were appropriate. Since none of the "aggravated circumstances" enumerated in General Statutes § 17a-111b are present in this case, it is clear that the court's determination was not made pursuant to that section but pursuant to General Statutes §§ 17a-110(b), 46b-129(k).
The father, however, insists that such efforts were nonetheless required. Although his argument is in some respects unfocused, the father appears to contend that DCF was required to make reasonable efforts to reunify his son and him up to the time of the court's finding that it need not do so. DCF's position is, in essence, that once the court finds that reasonable efforts are not appropriate, such a finding, effectively, operates retrospectively as well as prospectively.
 2.
"This issue presents a question of statutory interpretation. The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case. . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . ." (Citations omitted; internal quotation marks omitted.)Bell Atlantic Mobile v. Department of Public Utility Control,253 Conn. 453, 474, ___ A.2d ___ (2000).
Prior to the 1995 amendment to the statute, a trial court was only required to consider the efforts of DCF to reunify parents with their child in determining whether to terminate parental rights. See In re EdenF., supra, 250 Conn. 694-95. As a result of Public Acts No. 95-238 and Public Acts No. 96-246 § 18, such efforts became mandatory. At the time DCF took Gilbert into custody, General Statutes § 17a-112(c) required that for a court to terminate parental rights, it must find that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification effortsprovided such finding is not required if the court has determined at ahearing pursuant to subsection (b) of section 17a-110 or section 17a-111bthat such efforts are not appropriate. . . ." (Emphasis added.)
DCF's position is inconsistent with a harmonious reading of § 17a-112
with other relevant statutes. "We assume that the legislature attempts to CT Page 28 create a consistent body of law. . . . Assuredly, we are guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law. . . ." (Citations omitted; internal quotation marks omitted.) Paige v. Town Plan ZoningCommission, 235 Conn. 448, 455, 668 A.2d 340 (1995).
General Statutes § 17a-112(c)(1) refers to a determination by the court pursuant to either General Statutes § 17a-110 or § 17a-111b. Section 17a-110, refers to a determination at a hearing pursuant to General Statute § 46b-129(k) or § 17a-111b. All three statutes tie a finding of reasonable efforts to permanency planning. This is confirmed by the legislative history. 33 H.R. Proc Pt. 10, pp. 3734-3735, 6126 (May 25, 1995) (remarks of Representative Richard Tulisano); id., pp. 3746-3747 (remarks of Rep. Glenn Knierim). General Statutes § 46b-129(k)(1) provides that ten months after an adjudication of neglect or twelve months after DCF has obtained custody of a child pursuant to an order of temporary custody, DCF shall file with the court a motion for review of a permanency plan and to extend or revoke the commitment. A hearing must be held on the motion. General Statutes § 46b-129(k)(2) provides: "At such hearing, the court shall determine whether it is appropriate to continue to make reasonable efforts to reunify the child or youth with the parent. In making this determination, the court shall consider the best interests of the child, including the child's need for permanency. If the court finds thatfurther efforts are not appropriate, the commissioner has no duty to makefurther efforts to reunify the child or youth with the parent. If the court finds that further efforts are appropriate, such efforts shall ensure that the child or youth's health and safety are protected and such efforts shall be specified by the court, including the services to be provided to the parent, what steps the parent may take to address the problem that prevents the child or youth from safely reuniting with the parent and a time period, not longer than six months, for such steps to be accomplished." (Emphasis added.)
"Further" means "additional . . . in addition." Webster's New World Dictionary (2nd Col. Ed.). If a finding under § 46b-129(k) that "further efforts are not appropriate" were permitted to operate retrospectively to a remote time when DCF took custody of the child, DCF's refusal to use such efforts to reunify could, indeed usually would, lead inexorably to that very finding. This would render a nullity the requirement in § 17a-112(c) that DCF used reasonable efforts to reunify. "We do not believe it would be consistent to read the two statutes together so as to contemplate such a scenario." In re ValerieD., 223 Conn. 492, 534, 613 A.2d 748 (1992) (taking custody of baby shortly after birth cannot support a finding of lack of ongoing parent-child relationship 3 1/2 months later); cf. Kron v. Thelen, CT Page 29178 Conn. 189, 197, 423 A.2d 857 (1979) (statute should not be read to empower government official to nullify a party's statutory or constitutional right); Federal Savings Bank v. Columbia InternationalSite Consultants, Inc., 40 Conn. App. 64, 69, 669 A.2d 594, cert. denied, 236 Conn. 910, 671 A.2d 824 (1996) (same, applied to action of opposing party); Trap Falls Realty Holding Limited Partnership v. Board ofTax Review, 29 Conn. App. 97, 104, 612 A.2d 814, cert. denied,224 Conn. 911, 617 A.2d 170 (1992) (same, applied to action of government official). "We presume that the legislature had a purpose for each sentence, clause or phrase in a legislative enactment, and that it did not intend to enact meaningless provisions." In re the Adoption of BabyZ, 247 Conn. 474, 522, 724 A.2d 1035 (1999). "To hold otherwise would thwart the very purpose of the statute, which is impermissible under our well settled canons of statutory construction." Trap Falls Realty HoldingCo. v. Board of Tax Review, supra. Notably, § 46b-129(k) does not provide for a determination of the reasonableness of past efforts to reunite.
Moreover, the requirement that DCF use reasonable efforts to reunite parent and child is the general rule. First, § 17a-112(c)(1) is so constructed. "[A] proviso in a statute is to be construed strictly and takes no case out of the enacting clause which is not fairly within its terms." Clark's Appeal from Probate, 58 Conn. 207, 209, 20 A. 456
(1889). Second, the requirement that DCF use reasonable efforts to reunite parent and child comports with the public policy of Connecticut "to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care. General Statutes § 17a-101. "When a child is committed to the custody of the state, the state has a duty to provide supportive services to the parents to enhance the possibility of eventual reunification of the family." In reJessica M., 217 Conn. 459, 470, 586 A.2d 597 (1991). Third, federal law mandates that such efforts be expended, albeit only as a condition to the receipt of funds for foster care maintenance. See 42 U.S.C. § 671(a)(15).
General Statutes § 17a-111b, in contrast to § 46b-129(k), states: "The Commissioner of Children and Families may, at any time, petition the court for a determination on whether reasonable efforts to reunify the parent with the child are appropriate. The court may determine that such efforts are not appropriate if: (1) The parent has subjected the child to the following aggravated circumstances: (A) The child has been abandoned as defined in subsection (c) of section 17a-112; or (B) the parent has inflicted sexual molestation or exploitation or severe physical abuse on the child or engaged in a pattern of abuse of the child; (2) the parent has killed, through deliberate, nonaccidental act, a sibling of the child, or has required, commanded, importuned, attempted, conspired or solicited to commit the killing of the child or CT Page 30 sibling of the child, or has committed an assault, through deliberate, nonaccidental act, that resulted in serious bodily injury of the child or a sibling of the child; (3) the parental rights of the parent to a sibling have been involuntarily terminated within three years of the filing of a petition pursuant to this section, provided the commissioner has made reasonable efforts to reunify the parent with the child during a period of at least ninety days; or (4) the parent was convicted by a court of competent jurisdiction of sexual assault, except a conviction of a violation of section 53a-71 or 53a-73a resulting in the conception of the child." For three reasons, the court concludes that a finding pursuant to General Statutes § 17a-111b, unlike a finding pursuant to §46b-129(k), may retrospectively vitiate DCF's duty to use reasonable efforts to reunite parent and child.
First, § 17a-111b uses the phrase "whether reasonable efforts to reunify . . . are appropriate" rather than referencing "further efforts" as in § 46b-129(k). "Courts must presume that when the legislature chose the language contained in [§ 17a-111b], instead of the drastically different language in [§ 46b-129(k)], it intended to effect a change in the statute law." Pierce v. Albanese, 144 Conn. 241,247, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S.Ct. 36,2 L.Ed.2d 21 (1957). Second, if a judicial determination that reasonable efforts to reunify are not appropriate is based on one or more of the aggravated acts or circumstances enumerated in the section, such as abandonment or murder of a child, it would make little sense for DCF to have ever been obliged to reunify. "It is to be presumed that the General Assembly did not intend to work an absurd consequence." Bridgeport v. Stratford,142 Conn. 634, 643-44, 116 A.2d 508 (1955). Third, in the third of the aggravated circumstances enumerated in § 17a-111b — where parental rights with respect to a sibling have been terminated within three years — the legislature did impose a limited requirement of reasonable efforts to reunify "during a period of at least ninety days. . . ." "The legislature's use of words to itemize the situations that bring a statute into play connotes the legislative intent to exclude that which is not included." McNulty v. Stamford, 37 Conn. App. 835, 840,657 A.2d 1126 (1995).
This court recognizes that General Statutes § 17a-110(b), which references both § 46b-129(k) and § 17a-111b, speaks in terms of "continuing efforts." Specifically, General Statutes § 17a-110(b) provides: "At a hearing held in accordance with subsection (k) of section46b-129 and section 17a-111b, the court shall determine the appropriateness of continuing efforts to reunify a child with his family." (Emphasis added.) This language does not alter the court's conclusion that a finding under § 17a-111b may act retrospectively, since nothing in § 17a-111b prohibits the use of reasonable efforts to CT Page 31 reunify prior to the finding that reasonable efforts are "not appropriate." Thus, the legislature's use of the "continuing efforts" in § 17a-110(b) was not an inappropriate means of addressing situations arising under either § 17a-111b or § 46b-129(k).
For these reasons, the court holds that a finding pursuant to General Statutes § 46b-129(k) that "further efforts" to reunify a parent and a child are not appropriate does not necessarily vitiate the requirement pursuant to § 17a-112(c) that DCF use reasonable efforts to reunify from the time it takes custody of a child to the time of the court's finding, "unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts.
 3.
Here, however, the court finds by clear and convincing evidence that from the time DCF took custody of Gilbert up to the time of the court's finding that reasonable efforts were not appropriate, the father was, and he remains, unwilling to benefit from reunification efforts.
The father focuses on DCF's failure to afford him visitation with Gilbert after it took custody of the child on February 19, 1998. While visitation is usually a component of a reunification plan, the statute does not require reasonable efforts at visitation but reasonable efforts to reunify the child with the parent. As Judge Foley, formerly the presiding judge of the Child Protection Session, has observed, "providing services to rehabilitate the deficient parent is the crucial ingredient to reasonable efforts." In the Interest of Jessica H., Superior Court For Juvenile Matters, Judicial District of Child Protection Session at Middletown (April 20, 1998). For three reasons, the court finds by clear and convincing that between the time that DCF took custody of Gilbert and the time the court found that reasonable efforts were not appropriate, the father was unwilling to benefit from reunification efforts.
First, DCF attempted to provide the father with services prior to taking custody of Gilbert. DCF referred the father to the Dual Diagnosis Program at New Britain General Hospital; he failed to attend. DCF referred the father to Klingberg Family Centers in New Britain. It recommended that he get in-patient treatment; he refused. The father went to a physician in Bristol who recommended that he undergo drug evaluation and treatment; he refused.
Second, DCF social workers had good reason to believe that the father was a dangerous person to attempt to work with. Soon after DCF's involvement, the father told a DCF social worker that he would shoot anyone who took his child. At Klingberg Family Centers he verbally CT Page 32 threatened the workers who recommended that he seek treatment. He threatened the Prudence Crandall Shelter workers to such an extent that other residents of that facility felt threatened. As a result of this incident he was convicted of threatening and violation of a restraining order. Less than two months after being released from jail on account of these crimes, he was hostile and verbally abusive at an administrative case review at DCF.
Third, the father made it abundantly clear that he would not cooperate with service providers. He repeatedly stated that he was not willing to obtain the drug treatment that he needed. "The department is required only to make `reasonable efforts.' It is axiomatic that the law does not require a useless and futile act." In re Antony B., 54 Conn. App. 463,476, 735 A.2d 893 (1999).
The court finds by clear and convincing evidence that after DCF took custody of Gilbert until July 21, 1999, the father was unwilling to benefit from reunification efforts. After July 21, 1999, by statutory fiat and by virtue of the court's finding, reunification efforts were not required.
 C.
General Statutes (Rev. to 1999) § 17a-112(c)(3)(D) "provides for the termination of parental rights if, upon clear and convincing evidence, it is proved that no ongoing parent-child relationship has existed in excess of one year. This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . .
"It is reasonable to read the language of no ongoing parent-child relationship to contemplate a situation in which regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only. . . ." (Internal quotation marks omitted.) In re John G., 56 Conn. App. 12,22-23, 740 A.2d 496 (1999). CT Page 33
"In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment." In re Kasheema L., supra, 56 Conn. App. 487; id., 490; Practice Book § 33-3(a).
In In re Valerie D., 223 Conn. 492, 613 A.2d 748 (1992), our Supreme Court circumscribed the circumstances under which parental rights could be terminated for "no ongoing parent-child relationship." In Valerie, a child was taken from the mother and placed in foster care within a week of the child's birth. Approximately three and one-half months after the child's birth, DCYS (now DCF) filed a coterminous petition to terminate the mother's parental rights based, inter alia, on the lack of an ongoing parent-child relationship. For over two weeks prior to the filing of the petition, the mother was denied any visitation with her baby until she could produce a note from her physician stating that she was free of communicable diseases. Id., 528. The petitioner's expert testified that there was no parent child relationship.
The court observed that while General Statutes § 46b-129 authorized an order of temporary custody of Valerie based on a reasonable cause standard of proof, grounds for termination of parental rights must be established by clear and convincing evidence. Under the facts of the case, however, "once the child had been placed in foster care pursuant to the determinations made under § 46b-129, a finding of lack of an ongoing parent-child relationship three and one-half months later was inevitable" under the termination of parental rights statute. Id., 533. The court held that it would not "be consistent to read the two statutes together so as to contemplate such a scenario." Id., 534. Thus, the court concluded, General Statutes § 46b-129 and the termination of parental rights statute "cannot be read together so as to permit the custody determinations made under the first statute to lead directly to the termination determination under the second statute." Id., 535.
In Valerie, the child was a newborn when she was taken into custody. In this case, Gilbert was twenty months old. The petition to terminate parental rights was filed twenty-one months after he was taken into custody. The record does not establish whether father and son had a parent-child relationship before Gilbert was taken into custody. DCF bears the burden of proof on this issue. Assuming, therefore, that there existed such a relationship, it was extinguished after twenty-one months without any visitation.
The court holds that DCF cannot prevail on this ground of its petition. First, while it is true that the father's behavior led to DCF's decision to deny him visitation, this ground for termination focuses on whether the child has present memories or feelings for the natural parent CT Page 34 of a positive nature; In re John G., supra, 56 Conn. App. 23, not on the parent's conduct when not with the child. Second, the Supreme Court has signalled that DCF "may not, consistent with due process of law, create the conditions that will strip an individual of an interest protected under the due process clause." In re Valerie, supra, 223 Conn. 534. It was ultimately a discretionary decision of DCF that denied the father all visitation. Third, DCF has failed to prove that any preexisting parent-child relationship could have been maintained after twenty-one months even had DCF afforded the father visitation with his son. It is the petitioner's burden to prove the grounds of its petition; In reSavannah M., supra, 55 Conn. App. 811; and In re Valerie leaves little doubt that where questions such as these genuinely exist, it is the petitioner's burden to dispel them. In re Valerie, supra, 223 Conn. 512,535. The court holds that the petitioner has failed to prove this ground of its petition.
 D.
However, there is no question that DCF has proved by clear and convincing evidence that the father has failed to be rehabilitated. As of the adjudication date, the father remained a drug addict with no regular employment and a history of repeated incidents of domestic violence. He repeatedly had announced that he was not going to give up drugs nor cooperate with service providers. He "suffers from a clinically significant dysphoria which may represent a superimposed Dysthymia." The dysphoria puts the father in a "rotten mood" all the time, as Dr. Rogers testified. The Dysthymia, a low-grade depression, cannot be effectively treated without the father first addressing, or at least contemporaneously addressing, his drug abuse. In his evaluation of the father, Dr. Rogers concluded that because of his low intellect, substance abuse and personality traits, the father is unable to care for the child. Indeed, it is difficult for him to carry through on anything. There is no reason to believe that any of this will change in the future. See In re Jessica B., 50 Conn. App. 554, 559, 718 A.2d 997
(1998). By clear and convincing evidence, DCF has proved that the father has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, [he] could assume a responsible position in the life of [his] child. . . ." General Statutes § 17a-112(c).
 E. 1. Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent. CT Page 35
DCF referred the father to the Dual Diagnosis Program at New Britain General Hospital; he failed to attend. DCF referred the father to Klingberg Family Centers in New Britain. It recommended that he get in-patient treatment; he refused. The father went to a physician in Bristol who recommended that he undergo drug evaluation and treatment; he refused. This year, DCF referred the father to Catholic Family Services in New Britain. Their recommendation was for inpatient or intensive outpatient treatment in a Dual Diagnosis program that would address both the father's mental and substance abuse issues. By the time of trial, he was incarcerated.
2. Finding regarding whether DCF has made reasonable efforts to reunitethe family pursuant to the Federal Child Welfare Act of 1980, asamended.
As discussed supra, after DCF took custody of Gilbert, the father was unwilling to benefit from reasonable efforts to reunite his family.
3. Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.
On July 27, 1998, the court issued the following "expectations" to the father: Keep all appointments set by or with DCF, keep whereabouts known to DCF or your attorney; visit the child as often as DCF permits; participate in parenting counseling; participate in individual counseling, including anger management, and address mental health issues; participate in drug/alcohol counseling, including urine screens and hair test; cooperate with the terms of his probation; secure and maintain adequate housing and income; do not engage in substance abuse; have no involvement with the criminal justice system; ensure that all contact with Gilbert is supervised by DCF.
There is insufficient evidence that the father did not keep his appointments with DCF or keep his whereabouts known to DCF and to his attorney. He was not permitted visitation with his son. He resisted all services, although he did have some urine screens. Since the terms of the father's probation were not admitted into evidence, the court cannot find whether the father complied with or violated them. He did not secure and maintain adequate housing and income. He did engage in substance abuse. There is no evidence that the father had involvement with the criminal justice system between the time that expectations were pronounced and the filing of this petition. Subsequent to the filing of the petition, however, he had very serious criminal involvement with the police. He did CT Page 36 not violate the expectation that any contact with Gilbert be supervised by DCF.
4. Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.
Gilbert has no feelings for or emotional ties with his father. He loves his foster parents and they love him.
5. Finding regarding the age of the child.
Gilbert is 4 1/2 years old.
6. Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theforeseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.
The father has made no efforts whatsoever to adjust his circumstances, conduct or conditions to make it in the best interest for Gilbert to return to him in the future.
The father has been barred from contact with his son and his son's foster parents by DCF because of the father's behavior.
7. Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.
The father has been prevented by DCF from maintaining a meaningful relationship with his son. This, however, was not an unreasonable act or conduct by DCF. To the contrary, it was necessitated by the father's immature, threatening and outright violent behavior, including his violence toward Jodie, his threatening a DCF social worker if she took his child, and his violent conduct at the Prudence Crandall Shelter and at DCF's offices. CT Page 37
 F.
Finally, the court addresses disposition with respect to the father. That is, whether it would be in Gilbert's best interests to terminate his father's parental rights.
The following additional facts are found with respect to disposition. On December 21, 1999, the father was arrested for possession of narcotics, in violation of General Statutes § 21a-279(a); possession of drug paraphernalia, in violation of general Statutes § 21a-267(a); and interfering with an arrest, in violation of General Statutes §54-33d. Two weeks later, on January 4, 2000, he was again arrested for possession of narcotics and possession of drug paraphernalia. The following day, January 5, 2000, the father was evaluated for drug abuse at Catholic Family Services in New Britain. The recommendation was for inpatient or intensive outpatient treatment in a Dual Diagnosis program that would address both the father's mental and substance abuse issues. By the time of trial, he was incarcerated.
As discussed above, "[t]he best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment." (Citations omitted; internal quotation marks omitted.) In re Shyina B., supra,58 Conn. App. 167. All of these factors militate strongly in favor of terminating the father's parental rights so that he may be adopted by his foster parents, one of whom is his paternal aunt. As evidenced by the reduced time period within which parental rights with respect to a child under the age of seven may be terminated, the child's need for permanency are the most pressing when the child is of such a tender age. See In reEden F., supra, 250 Conn. 697. Moreover, the father is committed to drug abuse and cannot manage himself, let alone a young child. While "[t]he statute does not require the respondent to prove precisely when [he] will be able to assume a responsible position in [his] child's life;" In reJuvenile Appeal (84-3), 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984); in this case it does not appear that the father will ever be able to assume such a position. And while the statute does not require the respondent "to prove that [he] will be able to assume full responsibility for [his] child, unaided by available support systems"; id.; in this case, the father has consistently resisted all support.
The court finds, by clear and convincing evidence that it is in Gilbert's best interests that his father's parental rights be terminated. CT Page 38
The petition is granted as to both respondents. The court terminates the respondents' parental rights. It is further ordered that the Commissioner of the Department of Children and Families is appointed statutory parent for Gilbert for the purpose of securing a permanent adoptive family. Since the current foster parents wish to adopt Gilbert, it is the court's order that they receive first consideration. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 2nd day of January, 2001.
BY THE COURT
Bruce L. Levin Judge of the Superior